# In the United States Court of Federal Claims

No. 95-517 C
Filed April 13, 2007
TO BE PUBLISHED

| | |
|---|---|
| FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF ROCHESTER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | *Winstar*, damages, FIRREA, contract breach as cause of curtailed asset growth, lost profits based upon thrift's actual historic yields and costs of funds, failure to approve merger application as breach, damages due to compelled modified conversion, offset of benefits from such conversion, prior material breach, award of damages where Government bore economic risks of ownership of mutual thrift at time of breach |

David T. Case, Kirkpatrick & Lockhart Preston Gates Ellis LLP, Washington, D.C., for plaintiff. Joseph J. Brigati, Kirkpatrick & Lockhart Preston Gates Ellis LLP and Joseph P. Vitale, Kirkpatrick & Lockhart, LLP, Washington, D.C., of counsel.

Jerome A. Madden, Trial Attorney, William F. Ryan, Assistant Director, Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, Stuart E. Schiffer, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Gregory R. Firehock, Arlene Pianko Groner, William G. Kanellis, Delisa M. Sanchez, Trial Attorneys, United States Department of Justice, Washington, D.C., of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This *Winstar* matter is before the Court following a 27-day trial on damages held in Washington, D.C. The parties filed Post-Trial Proposed Findings of Fact and Conclusions of Law and responses thereto, and the Court heard closing arguments.

Rule 52(c) of the Rules of the Court of Federal Claims ("RCFC") governs "actions tried upon the facts," and provides that findings of fact may be "based on oral or documentary evidence . . . and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witness." RCFC 52(a). The Court heard testimony from fifteen witnesses. The fact witnesses included former executives and board members of First Federal Savings & Loan Association of Rochester ("First Federal" or "the Association"), including: Thomas Borshoff, former president, chief executive officer, and chairman; Mark Chaplin, former chief financial officer; Thomas Mullin, former senior vice president and general counsel; Peter Sear, former executive vice president and board member; and Professor Jack Guttentag, Professor of Finance Emeritus at the Wharton School of the University of Pennsylvania, and a former First Federal board member. The Government also introduced into evidence portions of the transcript of the deposition of Richard B. Coles, an officer of Canada Trust who became a director of First Federal after its acquisition by Canada Trust in May 1991. *See* Transcript of Proceedings, First Fed. Savings & Loan Ass'n of Rochester v. United States, No. 95-517C (Fed. Cl. Jun. 1 - Jul. 14, 2004) ("Tr.") 3881:16-3884:12; DX 1778 (Coles August 24, 2000 Dep. Tr.) at 1-64.

The Court also heard testimony from federal regulators of thrift institutions, including: Angelo Vigna, a former official of the Federal Home Loan Bank of New York ("FHLB-NY") and the Office of Thrift Supervision ("OTS"), who served as acting director of the Federal Savings and Loan Insurance Corporation ("FSLIC") from November 1985 through May 1986; Michael Simone, a former supervisory agent for the FHLB-NY; Simkha Palant, a former controlled associations branch chief at the FSLIC, who testified from Estonia via videoconference; Alvin Smuzynski, a former official of the Federal Home Loan Bank Board ("FHLBB") and OTS; and David Dorgan, former senior assistant director of OTS. The Government also introduced into evidence the transcript of the deposition of Thurman Connell, director of the FSLIC in 1986. *See* DX 1789 (Connell August 15, 2003 Dep. Tr.) at 903.

Dr. Donald Kaplan testified as an expert witness on behalf of First Federal. A consultant to financial institutions, Dr. Kaplan is the holder of a Ph.D. in finance and economics from UCLA. Tr. 2770:3-22, 2776:9-15 (Kaplan). He was qualified as an expert in finance and economics as applied to thrift institutions; thrift regulation, operation and valuation; and thrift capital-raising transactions. Tr. 2827:22-2828:8 (Kaplan). Dr. Kaplan served as chief economist and director of research for the FHLBB from 1975 to 1977. Tr. 2777:13-2789:2 (Kaplan); PX 735. Plaintiff also introduced into evidence the transcript of the deposition of William F. Wolf, the partner in charge of tax and accounting services for an accounting firm, who had been retained by the Government as an expert in taxation. Mr. Wolf earned an MBA from the University of Southern California and is a certified public accountant . Tr. 4089:22-4090:17; DX 1642 ¶ 1 & Ex. A. On behalf of the Government, Dr. Haluk Unal was qualified to testify as an expert in economics; finance; accounting; credit risk; and the process and pricing of mutual-to-stock conversions of financial institutions; the relationship of economics, finance and accounting to financial institutions and, in particular, to the economic ownership of mutual thrifts. Tr. 4136:16-19 (Unal). Dr. Unal holds a Ph.D. in finance from Ohio State University and teaches in the Department of Finance of the R. H. Smith School of Business at the University of Maryland.

Dr. David Rochester, CEO of a financial consulting firm that specializes in work with thrift institutions, also testified for the Government. He was qualified to testify as an expert in mutual-to-stock conversions and other capital-raising activities; financial institution management, operations and regulation; valuation and financial analysis of depository financial institutions; and financial and strategic planning for financial institutions. Tr. 4373:17-24, 4400:2-7 (Rochester). Dr. Rochester holds a Ph.D. from the University of Georgia with a concentration in banking and finance and a minor in economics. Tr. 4374:16-23 (Rochester). Finally, Dr. Andrew Carron was qualified to testify on behalf of the Government as an expert in financial economics; economic damages; thrift industry structure and performance; government policy and regulation of the thrift industry; mortgage and capital markets and products; and thrift industry asset and liability management. Tr. 5192:22-5193:3, 5206:15-25 (Carron). Dr. Carron, a senior vice president of an economic consulting firm, holds two masters degrees and a Ph.D. in economics from Yale. Tr. 5184:17-5185:1 (Carron).

## *BACKGROUND*

### I. Facts[1]

The factual background of the case was set forth in detail in Judge Merow's October 14, 2003 opinion, *First Federal Savings & Loan Association of Rochester v. United States*, 58 Fed. Cl. 139 (2003) ("*First Federal I*"). That background is summarized below.

In the early 1980s, the savings and loan industry experienced a severe financial crisis resulting from an increase in short-term interest rates. Thrifts were placed in the position of funding long-term, fixed-rate loans with higher priced short-term deposits. In an effort to mitigate the crisis, the FSLIC in 1981 created the Phoenix program. Under the Phoenix program, troubled thrifts were consolidated in an attempt to achieve efficiencies and create a stronger resulting institution. The consolidated thrift was closely supervised, with the hope that it could be stabilized until interest rates moderated, earnings could be generated, and a more long-term solution, such as recapitalizing or selling the institution, could be arranged. Tr. 375:15-17 (Vigna); s*ee First Federal I*, 58 Fed. Cl. at 141 ("[A] new institution would arise from the funeral pyre like the mythical Phoenix."); *see also LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1366-67 (Fed. Cir. 2003).

First Federal became the first participant in the Phoenix program. It was consolidated with four other thrifts. Because it had the strongest balance sheet and was deemed by FSLIC to have the strongest management of the four, First Federal was selected to be the surviving institution.

---

[1] Certain of the Court's findings of fact are set out in this section. The remainder of the Court's findings of fact and rulings on questions of mixed fact and law are set out in the Discussion section at pages 8-68, *infra*.

In 1984, the FSLIC put First Federal out for bid as a means of resolving the Association's status as a Phoenix institution. The only bid that the FSLIC received, however, was a recapitalization proposal that the Association itself submitted. The proposal recommended that the Government infuse First Federal with capital, forgive the Association's existing debt, and allow management to operate First Federal as a normal, healthy thrift. In exchange, First Federal's management would build the institution to a position where it could convert from a mutual to a stock institution[2] that would have sufficient capital to operate without FSLIC assistance. The FSLIC would also receive warrants to purchase stock in First Federal after it converted to stock form.

The FSLIC accepted First Federal's bid and, on August 8, 1986, executed a Financing Agreement ("Financing Agreement") incorporating First Federal's proposals. The Financing Agreement provided for an initial payment by the FSLIC of $200 million, as well as the cancellation of $158 million in debt in the form of income capital certificates and net worth certificates payable to the FSLIC. *See First Federal I*, 58 Fed. Cl. at 142, 148.[3] In addition,

---

[2] Mutual associations were permitted to convert to stock form by standard or modified conversions. *See* 12 C.F.R. §§ 563b.3, 563b.34 (1986). In a standard conversion, a mutual association is converted by issuing and selling stock in the public markets. *See* 12 C.F.R. § 563b.3(c). As part of such a standard conversion, "each eligible account holder shall receive . . . subscription rights to purchase capital stock" in the institution. *Id.* § 563b.3(c)(2). In a modified conversion, "the [FHLBB] will permit . . . deviance from the substantive and procedural requirements . . . for standard conversions." 12 C.F.R. § 563b.35 (1986). Associations were candidates for a modified conversion when it was determined that "(i) [s]evere financial difficulties exist which threaten the stability of the insured institution, and (ii) the conversion to stock form is likely to improve the financial condition of the institution." 12 C.F.R. § 563b.36(a)(2) (1986).

[3] "Under the Phoenix program, FSLIC provided financial assistance to First Federal by the purchase of Income Capital and Net Worth Certificates . . . to fund regulatory accounting practice (RAP) purchase accounting losses." *First Federal I*, 58 Fed. Cl. at 142.

Section 6.10 of the Financing Agreement specified that First Federal could operate with levels of capital lower than those required by the then current regulations.[4]

After the Financing Agreement was executed, First Federal's management prepared the Association for conversion to stock form by increasing asset growth, net worth, and earnings through "organic growth," *i.e.*, by originating adjustable-rate mortgages, and by purchasing wholesale assets, such as mortgage-backed securities. Management also sought to build First Federal's asset base by acquiring other financial institutions. Therefore, when the Federal Deposit Insurance Corporation ("FDIC") sought to sell Monroe Savings Bank ("Monroe"), a troubled, federally chartered, FDIC-insured, mutual savings bank that did business in First Federal's geographic area, the Association submitted applications to the FDIC and the FSLIC to acquire Monroe.

On August 9, 1989, the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") became effective. Pub. L. No. 101-73, 103 Stat. 183 (1989). Under FIRREA, thrifts were required to maintain certain levels of core capital reserves, tangible capital, and risk-based capital. 12 U.S.C. § 1464(t)(1)(A) (Supp. I 1989). FIRREA transferred the authority for regulating thrifts from the FHLBB to the OTS. *See Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221, 1224 (Fed. Cir. 2005). FIRREA also transferred thrift insurance activities from the FSLIC to the FDIC, and created the RTC to liquidate failed thrifts. *Id.* In November 1989,

---

[4] Section 6.10 stated:

> The amount of net worth required under 12 C.F.R. § 563.13 (1986) or any successor regulation shall not be required of First Federal. Instead, First Federal will be required to have a net worth/total liabilities ratio, computed in accordance with generally accepted accounting standards, greater than or equal to the following:
>
> | Years After Initial Closing | Minimum Net Worth/ Total Liabilities |
> |---|---|
> | 1-5 | 1.09 |
> | 6-7 | 1.41 |
> | 8-10 | 3.56 |
>
> However, if the net worth ratio should at any time fall materially below the required percentages then First Federal shall be in breach of this Agreement. In addition to any other remedies available, FSLIC shall have all the rights granted it under 12 C.F.R. § 563.13 (1986) or any successor regulation.

PX 17 (Financing Agreement § 6.10) at WOF0202005.

OTS issued Regulatory Release 89-61, "New Minimum Capital Requirements," which informed First Federal that it would fail FIRREA's capital requirements when they became effective on December 7, 1989.[5] *See First Federal I*, 58 Fed. Cl. at 143. OTS also issued Thrift Bulletin 36 ("TB-36"), "Guidelines for FIRREA Capital Plans, Exemptions and Exceptions." PX 281. TB-36 provided that a thrift failing FIRREA capital compliance could apply "for a limited capital exception, an exemption from a supervisory sanction or restriction, or a limited growth exception." *Id.* at FR001243. Thrifts applying for an exemption or exception were required to submit a Capital Plan demonstrating that they could meet FIRREA's capital requirements by December 31, 1994. *Id.* at FR001244. TB-36 also specified that a thrift that failed to meet applicable capital standards could only increase its assets "to an amount not to exceed the amount of net interest credited to its deposit liabilities." *Id.* In November 1989, Mr. Vigna of FHLB-NY informed First Federal's management that the Association's application to acquire Monroe would not be approved. Tr. 342:24-344:6, 1805:9-19 (Borshoff). In December 1989, OTS again informed First Federal that it did not satisfy the new capital requirements of FIRREA, and that it would be required to submit a Capital Plan in accordance with TB-36. *See First Federal I*, 58 Fed. Cl. at 143. OTS also indicated that failure to meet the benchmarks in the Capital Plan would subject the Association to "appropriate enforcement action." *Id.*

On January 5, 1990, First Federal submitted its Capital Plan ("Strategic Business Plan") to OTS. *First Federal I*, 58 Fed. Cl. at 143; PX 333. Later that month, OTS issued Thrift Bulletin 38-2 informing all thrifts that capital and accounting forbearances that had previously been granted by the Government were eliminated by FIRREA, and that OTS would determine capital adequacy without regard to any such forbearances. *First Federal I*, 58 Fed. Cl. at 143. OTS conditionally approved First Federal's Strategic Business Plan on May 22, 1990. PX 248. With some additional changes, a revised Conditional Approval of the Capital Plan was signed by OTS and First Federal on October 23, 1990. *First Federal I*, 58 Fed. Cl. at 144.

In May 1991, First Federal engaged in a modified conversion from mutual to stock form and was acquired by Canada Trust, a Canadian bank that was interested in gaining a foothold in the American financial services market. In exchange for 99 percent of First Federal's stock, Canada Trust provided First Federal with capital sufficient to satisfy FIRREA's capital requirements following certain portfolio restructuring transactions undertaken by First Federal. As part of the Canada Trust transaction, First Federal repurchased the warrant rights it had granted to the FSLIC incident to the Financing Agreement. Later, in 1997, Canada Trust sold

---

[5] After FIRREA transferred to the OTS the authority to regulate savings associations, OTS reissued the regulations in 12 C.F.R. chapter V, as revised pursuant to FIRREA, setting forth the new regulatory structure for the thrift industry. Most of the reissued regulations became effective on November 30, 1989. However, 12 C.F.R. §§ 567.1, 567.2, 567.5, 567.6, and 567.8 through 567.11 became effective December 7, 1989. Sections 545.131, 545.132, and 545.141(d) became effective December 15, 1989, and § 571.19 did not become effective until January 1, 1990. 54 Fed. Reg. 49,411 (Nov. 30, 1989).

First Federal to another financial services institution, HSBC, which merged First Federal into Marine Midland Bank, one of its subsidiaries.

## II. Procedural History

Judge Merow resolved nearly all of the liability issues in his October 14, 2003 opinion, holding the Government liable for breaching the Financing Agreement. *First Federal I,* 58 Fed. Cl. at 160. In a subsequent opinion, Judge Merow granted the Government's motion to dismiss First Federal's illegal exaction claim. *First Federal Savings & Loan Ass'n of Rochester v. United States*, 59 Fed. Cl. 667, 668 (2004) ("*First Federal II*").

At trial, the parties presented evidence on the following issues of liability and damages:

Issue 1: Whether the Government's breach of the Financing Agreement caused First Federal to curtail growth of profitable assets and suffer lost profits in the amount of $26.061 million from 1990 until it was acquired by HSBC in 1997.

Issue 2: Whether OTS's failure to approve First Federal's application to merge with Monroe Savings Bank constituted a breach of the Financing Agreement because it was based upon First Federal's failure to satisfy the capital requirements of FIRREA.

Issue 3: Whether First Federal suffered damages of $56.137 million as a result of OTS's failure to approve the Monroe merger application.[6]

Issue 4: Whether, if the Monroe merger had not gone forward, First Federal would have, but for the breach, replaced the assets that it would otherwise have acquired through the Monroe merger with similar assets and liabilities acquired in the market.

Issue 5: Whether First Federal suffered lost profits in the amount of $28.514 million between 1990 and 1997 as a result of its inability to replace the Monroe assets.

[6] First Federal's claimed damages attributable to the failure to approve the Monroe merger application included: $30.388 million in profits that First Federal would have earned on Monroe's assets between 1990 and 1997, less an insurance premium of $3.232 million that First Federal would have had to pay to the Savings Association Insurance Fund ("SAIF"), plus Monroe's deposit franchise premium of $28.981 million. Tr. 2831:24-2832:3, 3160:8-3167:16 (Kaplan); PX 8000 (Kaplan Demonstrative Book) at 71.

Issue 6: Whether First Federal suffered damages of $23.883 million as a result of its merger with Canada Trust in May 1991.[7]

Issue 7: Whether First Federal committed a prior material breach of the 1986 Financing Agreement that excused the Government's later breach.

Issue 8: To what extent any damages sustained by First Federal should be offset by the benefits First Federal derived from the Canada Trust transaction.

## ***DISCUSSION***

### I. The Government's Breach of the Financing Agreement Caused First Federal to Curtail Growth of Profitable Assets and to Lose Profits of $26.061 Million That It Would Have Earned Between 1990 and 1997 But For the Breach

As more fully discussed below, FIRREA caused the Association to forego asset growth of approximately $400 million in 1989, which resulted in lost profits of approximately $26 million in the period from 1990 until 1997 when First Federal was acquired by HSBC. The Government argues that a recessionary economy, not FIRREA, caused First Federal to fall short of its growth target ($700 million) in 1989. The Government also argues that it was not foreseeable that First Federal would achieve asset growth of the magnitude that it claims it would have in order to maximize the amount it would realize in a standard conversion. Finally, the Government argues that First Federal did not establish the amount of profits it lost on the so-called "foregone assets" with reasonable certainty.

#### A. In Order to Recover Expectancy Damages First Federal Must Satisfy the Requirements of Causation, Foreseeability and Reasonable Certainty

"There is nothing extraordinary about the contracts in [*Winstar*] cases . . . . When the Government enters into such contracts, 'its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'" *Winstar Corp. v. United States*, 64 F.3d 1531, 1551 (Fed. Cir. 1995) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)). Thus, the fact that the breach in this case was committed by the Government does not alter the remedies to which First Federal is entitled. *First Federal I*, 58 Fed. Cl. at 160 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 346, cmt. a (1981) ("'Every breach of contract gives

---

[7] First Federal's claimed damages attributable to the Canada Trust transaction included: (a) the $3 million cost of repurchasing warrant rights from the FDIC; (b) $1.983 million in costs and fees, including attorneys' fees of $880,000, New York State transfer fees of $403,000, and a $700,000 payment to management resulting from the change in control; (c) $11.5 million due to income lost by reason of the need to restructure First Federal's balance sheet in order to comply with FIRREA's risk-based capital standards; and (d) $7.4 million in lost tax benefits. PX 8000 at 83; Tr. 3601:13-3607:14 (Kaplan).

the injured party a right to damages against the party in breach' unless 'the parties . . . by agreement vary the rules'")), *aff'd in part, vacated in part, and remanded*, 189 F. App'x. 964 (Fed. Cir. 2006).

In *California Federal Bank v. United States*, the Federal Circuit clarified the burden that plaintiffs must bear in establishing a claim for damages due to breach of contract. "Contract remedies are designed to make the nonbreaching party whole. One way to achieve that end is to give the nonbreaching party 'expectancy damages,' *i.e.*, the benefits the nonbreaching party expected to receive in the absence of a breach." *Cal. Fed. Bank*, 395 F.3d 1263, 1267 (Fed. Cir. 2005) (citing *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1379 (Fed. Cir. 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 344(a)). "Expectancy damages ordinarily serve as the basis for an award of contractual damages." *Globe Sav. Bank, F.S.B. v. United States*, 65 Fed. Cl. 330, 345 (2005) (citing *LaSalle Talman*, 317 F.3d at 1371; RESTATEMENT (SECOND) OF CONTRACTS § 344 cmt. a; 24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 64:2, at 30 (4th ed. 2002)).

The Federal Circuit has explained that "[i]n order to be entitled to expectancy damages, which include lost profits, the plaintiff must satisfy three requirements." *Cal. Fed. Bank*, 395 F.3d at 1267. First, plaintiff must demonstrate that the loss was foreseeable. *Id.* (citing *La Van v. United States*, 382 F.3d 1340, 1351 (Fed. Cir. 2004); *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed. Cir. 2002); RESTATEMENT (SECOND) OF CONTRACTS § 351(1)). Second, plaintiff must establish that the breach caused its failure to earn the allegedly lost profits. *Id.* (citing *Rumsfeld v. Applied Cos.*, 325 F.3d 1328, 1339 (Fed. Cir. 2003)); *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007). "Third, the measure of damages must be reasonably certain, although if 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'" *Cal. Fed. Bank*, 395 F.3d at 1267 (citing *Glendale Fed. Bank, F.S.B. v. United States,* 378 F.3d 1308, 1313 (Fed. Cir. 2004) (quoting *Locke v. United States*, 151 Ct. Cl. 262, 267, 283 F.2d 521, 524 (1960))).

B. Causation

The Court of Appeals for the Federal Circuit recently stated that, in determining the proper standard of causation in an action for breach of contract, its precedents "may appear superficially somewhat inconsistent in applying the [less-stringent] 'substantial factor' and [more-stringent] 'but for' theories. We discern a common thread among them, however: the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank*, 474 F.3d at 1318. Although the Federal Circuit has sustained the use by the Court of Federal Claims of the "but-for" test in a number of cases, such approval does not "announc[e] any broad rule that the 'but-for' theory of causation must always, or even generally, be used in determining damages in *Winstar*-related cases or prohibiting the trial court from using the 'substantial factor' test in appropriate cases." *Id.* at 1319.

Although not required to meet the more-stringent but-for standard, First Federal has established that it would have earned the profits it seeks to recover but for the Government's breach. *Cal. Fed. Bank*, 395 F.3d at 1267 (citing *Rumsfeld*, 325 F.3d at 1340). First Federal need not establish that the breach of the Financing Agreement was "the sole factor or sole cause" of its lost profits. *Id.* at 1268. The existence of other factors operating in confluence with the breach will not preclude First Federal's recovery on a but-for theory. *Id.* (citing E. ALLAN FARNSWORTH, CONTRACTS § 12.1 at 150-51 (3d ed. 2004)). However, the causal connection between the breach and the loss of profits must be "definitely established" so that "the nonbreaching party will not be awarded more than it would have received if the contract had been performed." *Id.*

1. Historically, First Federal Had Achieved Its Goal of Increasing Its Assets In Order to Maximize Earnings Growth and Net Worth

Even as a Phoenix institution, First Federal had sought to grow its assets. The Association's assets grew from $4.023 billion in 1982 to $4.656 billion in 1985. PX 2000 (F. Fed. Asset Growth); Tr. 1086:1-3, 1088:2-6 (Chaplin).

Mr. Vigna, who in early 1986 was the acting director of the FSLIC, recognized that First Federal sought continued profitable growth. In an analysis of First Federal's proposed recapitalization plan, Mr. Vigna acknowledged that "in 1986, [First Federal] will allow expansion of its core businesses to be of greatest importance by seeking a balance between long-term growth and near-term profitability." PX 562 at FLT0030037; *see* Tr. 393:16-395:21 (Vigna). Mr. Vigna also noted that First Federal planned to "[u]ndertake ambitious asset and liability origination goals" by increasing mortgage originations by 72 percent, commercial lending by 143 percent, consumer lending by 22 percent, construction lending by 392 percent, retail deposits by 6.5 percent, and loan servicing volume by 14 percent. PX 562 at FLT0030038; Tr. 396:1-397:4 (Vigna). First Federal also had a goal of generating off-balance-sheet assets. PX 562 at FLT0030037. Later, Thurman Connell, who succeeded Mr. Vigna as acting director of the FSLIC, recommended that the FLHBB approve First Federal's proposed recapitalization plan. PX 14 at WOT7240060. Mr. Connell wrote that First Federal had been "extremely profitable with respect to its new business," highlighting the fact that the Association had booked $1 billion of new business in 1985. *Id*. at WOT7240052-53. Mr. Connell also endorsed the abilities of First Federal's management team:

> There is much 'new blood' within the organization, and as a result, management has analyzed and initiated many new ideas so that it may compete successfully in the financial services industry. [The FSLIC] staff has found [First Federal's] management to be most competent; furthermore, staff is confident in management's ability to carry out its future strategies successfully while not subjecting the Association to undue interest rate and credit risk.

*Id*. at WOT7240053. Those future strategies centered upon profitable asset growth. PX 562 at FLT0030037; *see* PX 518 at WOF02083.

In 1988, First Federal expanded its loan origination network in order to achieve increased growth. PX 68 (1988 Business Plan) at FR353882-83. By the end of 1988, First Federal had achieved asset growth of $640 million in that year. PX 2000; Tr. 1546:1-1547:4 (Chaplin). The Association was prepared to continue growing in 1989. The 1989 Budget provided for growth in the Association's assets of approximately $700 million, from total assets of $5.4 billion at the end of 1988 to $6.1 billion in 1989. PX 62 (1989 Budget) at FR355134; Tr. 1199:18-1200:6 (Chaplin). Mr. Chaplin testified convincingly that the growth plans reflected in the 1989 budget, though ambitious, were "absolutely" feasible and realistic. Tr. 1196:5-1197:3 (Chaplin); *see also* PX 645 at FR370148.

From the time it executed the Financing Agreement, First Federal sought to maximize earnings growth and net worth. Tr. 2878:1-2879:6 (Kaplan). By doing so, First Federal expected to increase the amount it would receive in a standard conversion, and also position itself to meet regulatory capital requirements when the Financing Agreement came to an end. Tr. 2880:4-2881:7 (Kaplan). First Federal planned to achieve these objectives by increasing asset growth by 10 to 12 percent per year. Tr. 2879:10-22 (Kaplan).[8] There are other ways to increase earnings, such as reducing overhead and increasing the interest rate spread, but asset growth is at the "top of the list" of the ways a thrift institution increases earnings. Tr. 2864:6-2865:17 (Kaplan).

In order to achieve its goals, First Federal developed a strategic plan that included a 10-year mission statement and several "corporate maxims." Tr. 144:17-145:19 (Borshoff). The second corporate maxim stated: "The accumulation of capital through earnings growth and other sources will be the central focus that will give the Association the means to achieve all other aspects of the Mission Statement." PX 67 (1987 Bus. Plan) at FR354880; Tr. 151:14-25 (Borshoff).

The Government argues that First Federal, in fact, subordinated asset growth to the goal of increasing its net worth ratio. Tr. 4476:19-4479:17 (Sear), Tr. 5234:5-5235:5 (Carron); DX 464 at FR083048-49; DX 513 at FR439339-40. Mr. Borshoff, the former president, chief executive officer, and chairman of First Federal, conceded that "[i]n general" First Federal would not add assets if the effect would be to reduce the Association's net worth ratio. Tr. 711:15-715:6 (Borshoff).

---

[8] Asset growth helped First Federal spread its operating costs over a larger base, thereby decreasing operating ratios and permitting the Association to be more profitable. Tr. 1192:19-1193:1, 1195:11-20 (Chaplin); PX 645 (October 21, 1988 Memorandum Re: 1989 Budget) at FR370147. Asset growth can be a successful strategy for increasing earnings. Assuming equivalent asset quality, interest rate risk, and comparable operating characteristics, an institution with more assets will have higher earnings. Tr. 712:13-24, 713:10-25 (Borshoff).

However, Mr. Chaplin, First Federal's former chief financial officer, stated that First Federal's primary objective was to grow earnings through asset growth. Tr. 2337:3-5 (Chaplin). First Federal established that while strengthening net worth ratios was an important objective of the Association, management was not fixated on any specific net worth ratio. Mr. Chaplin explained that:

> Our primary objective was to grow earnings, and the earnings were being grown through growth. That was our primary objective. Certainly, we had a duty and a secondary goal of increasing capital. However . . . we looked at the longer-term economic benefits that were coming from individual activity and weren't fixated on an individual number at a point in time. So to make this as clear as I possibly can, we were trying to increase – to build a value that investors would pay the most for when we converted the institution, and they wouldn't pay for an existing net worth ratio at a point in time. They would pay for our earnings and future prospects of earnings growth, and that was really our key focus.

Tr. 2337:3-16 (Chaplin).

The Government points out that in early 1989, First Federal recognized that funding its budgeted asset growth would be more costly than planned. PX 134B at FR344581; Tr. 4510:5-4512:24 (Sear). Although retail deposits tended to be the least costly source of funds, the Government maintains that due to increased pressure in the retail markets, First Federal suffered unanticipated deposit runoff and was forced to rely upon typically more expensive sources of funds such as Federal Home Loan Bank advances and brokered deposits. *See* DX 558 at FR09970-71; DX 562 at 1; DX 571 at FR098180-82; DX 575 at FR098193-94; DX 513 at FR439486; DX 2046 at 46; Tr. 4518:2-4522:3, 4524:1-4528:18 (Sear); Tr. 5573:3-5574:19, 5582:11-5584:17 (Carron). The Government contends that First Federal, rather than paying any price to fund additional growth, instead slowed things down and reduced the level of competitiveness in its pricing structure to maximize profitability. *See* Tr. 4519:2-4520:24 (Sear); *see* PX 676 at FR199514. The Government argues that First Federal had difficulty in managing its liability costs and that the difficulty was exacerbated by problems in maintaining sufficient liquidity. DX 571 at FR098181; DX 575 at FR098191-94; Tr. 4527:12-4528:18 (Sear). In late 1988, First Federal's Asset and Liability Management Committee had adopted a comprehensive liquidity management policy. The policy was adopted in order to ensure that the Association had adequate amounts of cash on hand in order to "react to the market and to take [advantage of] opportunities within the market." Tr. 4505:12-4506:10 (Sear); DX 496 at 5-6. The Government points out that during a March 8, 1989 meeting, the Asset/Liability Management Committee recognized that "the Association faces the choice of increasing its liquidity with relatively high cost sources of funds, or reducing its investment in new assets." DX 575 at FR098194; Tr. 4527:12-4528:18 (Sear).

There is no evidence, however, that the Association actually reduced its growth in March 1989. Nor does the evidence support the notion that First Federal's asset growth was hampered

by any shortage of liquidity. Tr. 5671:15-5673:19, 5675:21-24 (Chaplin). The Association's asset origination and acquisition activity also belie that notion. By April 30, 1989, in fact, First Federal's assets had grown by more than $250 million. *Compare* PX 47D (April 1989 Financials) at FR193063, *with* PX 45L (Dec. 1988 Financials) at FR192952. At the rate of growth First Federal achieved through April 1989, the Association was on track to grow its balance sheet by more than $700 million by the end of 1989.

2. FIRREA Caused First Federal to Curtail Asset Growth

In May 1989, however, the Association became concerned that it would have to comply with proposed FIRREA capitalization regulations and it wanted to be able to do so. *See* Tr. 214:5-215:4 (Borshoff). As a result, First Federal decided to curtail growth. *Id.* As Mr. Borshoff explained:

> [T]his is the era of FIRREA, and this is the period in which we are first being advised that . . . we are going to have to meet the regulations that are going to come through on new capital standards. And in that concern, we made the conscious decision to slow the growth of the balance sheet down and put emphasis on a higher capital ratio than we otherwise would have continuing our growth.

*Id.* In light of the upcoming capital restrictions of FIRREA, and looking toward the business planning process for 1990, First Federal reduced its growth projections.

By the end of July 1989, despite changing market conditions and management's decision to slow growth, First Federal still managed to achieve $349 million in asset growth, nearly half of the $700 million projected in its 1989 Budget. PX 47F at FR193175; Tr. 1207:9-12 (Chaplin).

When FIRREA became effective on August 9, 1989, First Federal decided to stop additional balance sheet growth until the implications of the legislation became clearer. Tr. 220:20-222:14 (Borshoff). "We determined that the safest and most prudent course of action was to attempt to not grow the institution and . . . reduce our growth pattern. Growing under our historic plan was not a wise thing to do in the face of FIRREA and what we were being told." Tr. 224:3-7 (Borshoff). According to Mr. Chaplin, there was clear concern over FIRREA and "definitely in the third quarter [the Association] had hit the brakes." Tr. 1605:14-1606:10 (Chaplin). Dr. Kaplan concurred, testifying that "based on all of the analyses that I've done and after hearing the testimony of both Mr. Borshoff and Mr. Chaplin, my conclusion is that the FIRREA legislation, as conveyed to the [A]ssociation by the regulators, caused them to completely shut down their growth in the summer of 1989." Tr. 2954:8-18 (Kaplan).

First Federal's balance sheet shrank by approximately $60 million during August 1989. PX 47H (Aug. 1989 Financials) at FR193204. As of October 1989, First Federal still accepted all loan applications that it received, but the Association continued to curtail growth by reducing its loan origination network and by adjusting its pricing mechanisms, such as raising interest

rates offered on mortgages, or adjusting underwriting criteria to limit mortgage volume. Tr. 1617:2-14, 1618:12-20, 2434:24-2436:7 (Chaplin).

By the end of 1989, First Federal had $5.64 billion in assets. PX 47L (Dec. 1989 Financials) at FR193313. The Association grew by only $277.6 million during 1989, *id.*; Tr. 1258:3-19 (Chaplin), falling short of its budgeted growth by approximately $430 million.

3. <u>But For the Breach, First Federal Would Have Added Approximately $400 Million in Additional Profitable Assets ("the Foregone Assets") to its Balance Sheet by the End of 1989</u>

Dr. Kaplan concluded that but for the breach, First Federal would have added approximately $430 million in additional assets in 1989. Tr. 3145:4-3146:4 (Kaplan). For purposes of his calculation of damages, Dr. Kaplan rounded that figure down to $400 million. Tr. 3148:19-3149:1 (Kaplan).

First Federal showed that, but for the breach, it would have continued its growth by acquiring adjustable-rate mortgages and mortgage-backed securities. Dr. Kaplan explained that the Association had a whole loan adjustable-rate mortgage[9] portfolio of approximately $2.7 billion as of year-end 1989. This represented approximately half of the Association's assets. Tr. 2979:20-2981:3 (Kaplan); PX 8000 at 38; PX 687 at FR216554. Dr. Kaplan also estimated that several hundred million dollars worth of First Federal's $900 million in mortgage-backed securities were made up of adjustable-rate mortgages. Tr. 2982:12-2983:1 (Kaplan). Second, First Federal showed that the national mortgage market could have accommodated First Federal's planned growth. As Dr. Kaplan testified, on a national basis, mortgage-backed securities comprised of adjustable-rate mortgages issued in 1989 were approximately $40 billion, and adjustable-rate mortgage whole loans originated in 1989 were approximately $120 billion. Tr. 2985:6-17, 5891:13-5893:2 (Kaplan). Mr. Chaplin testified that although self-originated loans were more profitable for First Federal, its earnings on purchased loans and mortgage-backed securities were still substantial. Tr. 2432:19-2434:12 (Chaplin).

Mr. Chaplin also testified that, beginning in late 1989, there were bank branches available to be acquired. Those branches represented further opportunities to acquire assets. Had OTS not required First Federal to limit asset growth, the Association would have attempted to pursue those opportunities. Tr. 2321:15-2323:2, 2324:24-2325:2, 2327:8-20, 2401:7-2402:14 (Chaplin). The opportunities to acquire branches expanded because the RTC was beginning to liquidate savings associations. Tr. 1261:24-1262:9, 2322:22-2323:2 (Chaplin). That made it possible to acquire deposit franchises for almost no cost. *Id.* Mr. Chaplin testified that the Association had not analyzed any specific opportunities to acquire assets in late 1989 or 1990. Tr. 2400:18-19. In late 1989, First Federal did not analyze any growth opportunities because "we were concerned

---

[9] "Whole loan" adjustable-rate mortgages are distinct from mortgage backed securities. Tr. 2980:15-18 (Kaplan).

about being seized ourselves." *Id.* In 1990, First Federal was "struggling to comply with our own TB-36 capital plan." Tr. 2400:21-22 (Chaplin). In the course of developing that plan, First Federal was told by OTS that it could not grow. Tr. 1254:9-1256:-6, 2400:23-2401:6 (Chaplin); PX 338 at FR0040769-70. Mr. Chaplin testified that, but for the breach, First Federal would have sought to acquire certain branches of Columbia Federal, another thrift institution in the Rochester area. Tr. 2335:1-17 (Chaplin). The Association, as Mr. Chaplin reiterated, was intent on increasing earnings through growth and thereby building a value that investors would regard as attractive when the institution converted from mutual to stock form. Tr. 2335:23-2336:12, 2337:2-16 (Chaplin).

The Government disputes that First Federal had either the capacity or the resources to grow by an additional $400 million in 1989. The Government argues that a flattening of the yield curve in early 1989 led customers to shift their preferences from adjustable-rate to fixed-rate mortgages. Defendant's Proposed Findings of Fact ("DPFF") ¶ 129. According to the Government, the Association felt the effects of this shift as early as January 1989. "[T]he price differential between a fixed rate mortgage and an adjustable rate mortgage is so narrow that the consumer's preference is shifting towards the fixed rate product." PX 103A at FR342210-11; *see* Tr. 4514:13-4515:21 (Sear), 5023, 5025-26 (Guttentag). At the same time, the Government contends, First Federal decided to "increas[e] the mix of fixed rate loan production to be sold in the secondary market, and increas[e] adjustable-rate loan prices" in its "efforts to decrease its near term funding needs to reduce the level of high-cost funds acquired." PX 134B at FR344581; Tr. 4510:5-4512:24 (Sear). Mr. Sear, who was called as a witness by the Government, testified that the effect of this strategy was that (1) growth in fixed-rate products would only stay on the balance sheet for one or two months; (2) increased prices for adjustable-rate mortgages would reduce the volume of adjustable-rate mortgages First Federal could generate; and (3) it would be difficult to achieve budgeted asset growth through loan production. Tr. 4515:11-4517:10 (Sear); PX 103A at FR342211.

Dr. Carron testified that there was also scarcity in the wholesale market for alternative sources of assets, particularly mortgage-backed securities comprised of adjustable-rate mortgages. Tr. 5323:14-5324:4 (Carron). Many institutions preferred to hold onto their adjustable-rate mortgages and sell fixed-rate loans in the secondary market so as to avoid excessive interest rate risk. Tr. 5322:13-20 (Carron).[10] Dr. Carron acknowledged that these securities were available, but because they were scarce, they were not available at "a level that would earn you a decent rate of return." Tr. 5321:1-20 (Carron). However, as noted earlier, Mr. Chaplin testified that although self-originated loans were more profitable for First Federal, its earnings on purchased loans and mortgage-backed securities were still substantial. Tr. 2432:19-2434:12 (Chaplin). Mr. Chaplin was on the witness stand for five and one-half days. The Court found him to be very knowledgeable and completely honest and straightforward. His testimony was clear, precise and credible. In the face of a searching cross-examination, Mr. Chaplain

---

[10] Indeed, First Federal followed a similar strategy. Tr. 5023:1-5, 5025:15-5026:4 (Guttentag).

maintained an even and professional demeanor, conscientiously seeking to explain complex matters in plain English for the benefit of counsel and the Court. Thus, the Court credits Mr. Chaplin's testimony regarding the asset growth that First Federal would have achieved but for the breach.

First Federal established through the testimony of Mr. Chaplin and Dr. Kaplan that the Association was focused on growth throughout 1989, and it had the capability and resources available to achieve that growth, even in the midst of shifting economic currents. For example, Dr. Kaplan noted that as of mid-May 1989 First Federal was "looking at a forecast of nearly a billion dollars of growth [for the years 1989 and 1990]." Tr. 3150:4-5 (Kaplan); PX 676 at FR199514. Dr. Kaplan added: "And it just seems to me that the $400 million of forgone assets that we're talking about in this context, in these time frames, is a very, very conservative amount to be incorporating into a damages calculation. I have absolutely no doubt that this . . . would have been achieved." Tr. 3150:5-10 (Kaplan); *see* Tr. 1259:11-1264:8; 2431:10-2434:12 (Chaplin).

The Government next points out that First Federal, like the rest of the thrift industry, began suffering increasing delinquency rates and levels of non-performing assets during the second half of 1989. Tr. 4536:8-23 (Sear), 5326:7-22 (Carron); DX 2046 at 35. The Government contends that the increase in non-earning assets reduced the overall return that First Federal could earn on its assets, and, if assets had to be written off at a loss, directly reduced the Association's earnings and net worth. *See* Tr. 4535:8-4537:1 (Sear), 5036:6-24 (Guttentag), 5326:7-22 (Carron), 1872:1-1873:15 (Chaplin); *see also* PX 134AA at FR233241; PX 103K at FR233251. Dr. Carron testified that the appropriate response to that situation was for First Federal to be more cautious about lending and to maintain a larger capacity to add to loan loss reserves. Tr. 5326:14-22 (Carron). The Government points out that First Federal booked higher loan loss provisions than expected in 1989. Tr. 5326:23-5327:5 (Carron); DX 2046 at 19.

Mr. Chaplin, however, provided credible testimony that the Association's analysis of loan delinquencies in early 1990 showed that they were attributable to earlier underwriting deficiencies that were corrected at that time. Tr. 2421:6-2424:5 (Chaplin). Also, Dr. Carron acknowledged that First Federal's loan delinquency rate was substantially below industry averages and that he did not know whether the Association's loan losses increased during the period. Tr. 5538:12-5539:23 (Carron).

The Government argues that because the period from 1990 to 1991 was a very difficult time for the thrift industry, it is unlikely that First Federal would have had profitable opportunities to grow its balance sheet significantly if there had been no breach. Tr. 5397:17-24 (Carron). The Government notes that the deterioration in economic conditions and the customer shift to fixed-rate mortgages that began in 1989 continued into 1990. DX 979 at FR477759. As a result, the Government contends, First Federal's shift to production of fixed-rate mortgages over adjustable-rate mortgages became more pronounced in 1990, during which 59 percent of production was fixed rate and sold into the secondary market. Tr. 5324:1-4 (Carron); PX 9 at

FR000510. Another factor, however, limiting the volume of First Federal's adjustable-rate mortgage loan originations in 1990 and 1991 was curtailment of the Association's loan origination network. First Federal had reduced its loan origination capacity in reaction to FIRREA. Tr. 2003:8-16 (Chaplin) ("Q: And that reduction in capacity . . . that was a decision made by First Federal management; right? A: In the context of the impending FIRREA balance sheet growth requirements, yes."). And, again, First Federal had alternatives for achieving balance sheet growth, including purchasing adjustable-rate mortgage loans wholesale or via the Association's correspondent lending network, and by purchasing fixed- or adjustable-rate mortgage-backed securities. Tr. 2431:21-2432:18; 2461:7-16 (Chaplin). First Federal did not pursue such alternatives in 1990 because the Strategic Business Plan submitted to comply with TB-36 ultimately required First Federal to maintain zero growth. Tr. 2461:21-24 (Chaplin).

The Government further points out that in the 1991 Business Plan, First Federal listed as one of the "operating environment factors" that was projected to impact the Association's financial performance "[t]he weak primary real estate market in the Metro New York Region, [which] has reduced the Association's ability to generate assets from traditional sources to a level insufficient to maintain balance sheet footings." DX 968 at FR253443-46. However, the 1991 Business Plan also referred to five more important growth-limiting factors, four of which related to FIRREA and its impact on First Federal. The most significant of the FIRREA-related factors was described as follows:

> FIRREA has reduced the Association's leverage capacity by mandating increased levels of capital to support existing leverage. FIRREA has also resulted in the assessment of excessive insurance premiums, and decreased Federal Home Loan Bank of New York stock dividends.

*Id.*; Tr. 2480:15-2483:8 (Chaplin).

The Government contends that poor market conditions persisted in 1991 and that First Federal attributed its inability to grow its balance sheet and its higher than average loan loss reserves to "the weak real estate environment in the Company's primary lending markets." PX 471 at WOL4441233; *see* PX 10 at FR000028. The evidence shows, however, that OTS prohibited First Federal from undertaking any asset growth in 1990 and 1991. Despite the fact that TB-36 allowed thrifts to grow up to the amount of net interest credited, PX 281 at FR001244, OTS required First Federal to reduce its balance sheet growth to zero before it would approve the Association's Strategic Business Plan. PX 345 at 0FR0020295; Tr. 1254:9-1255:6; 1256:3-19; 1624:19-1625:9; 1628:24-1629:7; 1632:14-1635:11 (Chaplin); 799:22-800:4; 817:4-11 (Borshoff). The Government disputes that First Federal was forced to cut all balance sheet growth. However, Mr. Dorgan, one of the OTS regulators reviewing First Federal's Strategic Business Plan, informed Mr. Chaplin that the Strategic Business Plan as it had been submitted on January 5, 1990 would *not* be approved, and that the Association was required to modify the plan to provide for zero percent growth. Tr. 1254:9-1255:6; 1256:3-19; 1633:10-1634:25 (Chaplin); *see also* Tr. 2670:2-2671:5 (Simone). The Government did not offer direct evidence to refute

Mr. Chaplin's testimony on this issue, and the Court found Mr. Chaplin's testimony with regard to conversations he had during the process of securing approval of the Association's Strategic Business Plan to be credible. Mr. Dorgan testified that he did not believe he would have told First Federal to reduce its growth, Tr. 5102:4-5103:11, but he admitted that he did not recall First Federal's Strategic Business Plan, OTS's review of it, or any conversations that he had with First Federal about its plan. Tr. 5108:24-5110:7; 5115:5-7 (Dorgan). In light of the foregoing, the Court finds that First Federal established that but for the breach, it would have added approximately $400 million in profitable assets to its balance sheet by the end of 1989 and would have achieved its goal of $700 million in asset growth for that year.

4. But For the Breach, First Federal Would Have Earned Profits On the Foregone Assets in the Amount of $26.061 Million In the Period From 1990 to 1997

Dr. Kaplan calculated the earnings First Federal would have realized on the $400 million in foregone assets during the period of 1990 to 1997. To do so, Dr. Kaplan first determined the Association's historical average highest-cost source of funds. He then determined the category of First Federal's assets that historically yielded the lowest average return. Next, he subtracted the former cost from the latter return and used the resulting difference or "spread," 87 basis points,[11] to calculate the profits First Federal would have earned on the $400 million of foregone assets. Tr. 3153:10-3156:12 (Kaplan). Dr. Kaplan's spread income was based on First Federal's actual, historic yields and costs from 1989 until the end of 1996. PX 737 (Corrected Kaplan Expert Report) at Ex. 7 (First Federal Historical Yield Cost Analysis); PX 8000 at 75; Tr. 3153:10-15, 3155:19-21; 4057:1-6 (Kaplan).

Applying the 87-basis-point spread to the $400 million in foregone assets, Dr. Kaplan calculated the amount of lost profits on the foregone assets in each year from 1990 to 1997 as follows:

| | | |
|---|---|---|
| 1990 | $ | 3,480,000 |
| 1991 | $ | 3,480,000 |
| 1992 | $ | 3,480,000 |
| 1993 | $ | 3,491,000 |
| 1994 | $ | 3,632,000 |
| 1995 | $ | 3,814,000 |

[11] One basis point is the equivalent of one-hundredth of one percent, *i.e.*, 0.01 percent. BLACK'S LAW DICTIONARY 161 (8th ed. 2004). Thus, for example, 87 basis points is the equivalent of 0.87 percent.

| | |
|---|---|
| 1996 | $ 4,004,000 |
| 1997 | $ 680,000 |
| Total | $ 26,061,000 |

Tr. 3156:13-3158:22 (Kaplan); PX 8000 at 68.

Though First Federal proffered evidence to show that, but for the breach, First Federal would have continued to grow its assets after 1989, *see* PX 676, Dr. Kaplan calculated lost profits in the years from 1990 to 1992 only on the $400 million in assets foregone in 1989, and he did not seek to calculate any profits that may have been lost on the foregone assets in 1989. Tr. 3149:3-12 (Kaplan). Dr. Kaplan assumed no growth of the $400 million in assets from 1990 until mid-1993. From the middle of 1993 until First Federal was acquired by HSBC in early 1997,[12] Dr. Kaplan assumed an annual growth rate of five percent, though First Federal actually experienced 7.5 percent annual growth during that period. Tr. 3149:14-3150:1 (Kaplan). Dr. Kaplan explained that the annual figures set forth above do not equate exactly to the projected amount of foregone assets in each year multiplied by 87 basis points because they are year-end figures and his model calculated lost profits from the foregone assets on a quarterly basis. Tr. 3157:5-3158:22 (Kaplan).

The Government criticizes Dr. Kaplan's calculation of lost profits on the grounds that: (1) it lacks sufficient foundation, (2) it is a "whole bank number" rather than an analysis of marginal income, and (3) that it does not account for overhead or credit risk. The Government maintains that even if First Federal had added $400 million in assets in 1989 as Dr. Kaplan claims, there is no basis to believe it would have earned 87 basis points on those assets between 1990 and 1997. Tr. 5376:4-5382:11 (Carron); DX 2046 at 59.

However, the yield percentages and costs on which Dr. Kaplan based his spread of 87 basis points were historical averages based upon the actual results of First Federal from 1989 until the end of 1996. Tr. 3153:10-15; 3155:19-21; 4057:1-6 (Kaplan). As Messrs. Chaplin and Borshoff testified, the assets that would have been obtained but for the breach were the same types of assets that First Federal had historically acquired. Tr. 294:17-296:18, 297:10-19 (Borshoff); Tr. 1261:16-1264:8 (Chaplin). Therefore, it was reasonable for Dr. Kaplan to utilize First Federal's actual, historical rates of return and costs to determine the lost spread income. Tr. 5908:14-5910:10 (Kaplan). The Court finds that Dr. Kaplan's calculation of lost profits on the foregone assets was based upon First Federal's historical track record and was both sound and reliable.

With regard to the criticism that the spread of 87 basis points was a whole bank number – as opposed to an analysis of marginal income – Dr. Kaplan stated that no database exists that

[12] *See First Federal I*, 58 Fed. Cl. at 154.

allows one to capture marginal rates. Tr. 4060:10-18 (Kaplan). In addition, the evidence showed that in the period prior to FIRREA, First Federal's marginal income reflected a return of 200 basis points. PX 14 at WOT7240053. *See also* DX 968 at FR 253447 ("Marginal ARM originations generally return 100 [basis points] in interest margin in the first year . . . ."). Dr. Kaplan explained persuasively that the yields and costs he used to calculate the 87-basis-point spread were "a very fair and unbiased representation of what the company's yield and cost experience actually was." Tr. 4060:3-5. Dr. Kaplan testified, "I've excluded nothing. It covers all of the time periods. This reflects all of the events, whether it's economic conditions in the marketplace, changes in business strategy. This is an all-in calculation." *Id.* at 4060:5-9.

With regard to the Government's argument that Dr. Kaplan did not address issues such as credit risk and overhead in deriving his spread of 87 basis points, Dr. Kaplan testified that, in determining the spread between cost and yield, he used the yield on mortgage-backed securities, historically First Federal's lowest yielding category of assets. Because the assets in mortgage-backed securities are pooled and guaranteed, Dr. Kaplan testified, credit risk has been largely eliminated. Tr. 4058:18-22 (Kaplan). Further, to determine cost, Dr. Kaplan used the cost of borrowed funds, First Federal's highest cost source of funds. Dr. Kaplan stated that his use of that source permitted him to disregard overhead:

> By using cost of borrowed funds, which is a wholesale source of funding, as opposed to the cost of deposits, which is a retail source . . . you don't incur the whole raft of operating expenses that are associated with managing an extensive branch network, having all of the staff and back office, the marketing. A borrowing cost basically at the end of the day means you avoid all of the operating expenses, because you either pick up the phone or call the source of the borrowed moneys. And those costs really drop out of the equation.

Tr. 4059:6-16 (Kaplan).

As the Court of Federal Claims held in *Commercial Federal Bank, F.S.B. v. United States*, another *Winstar* case in which Dr. Kaplan applied a similar damages methodology:

> It is true that competition and economic conditions can affect the profitability of a business, but that is true not only during the period of breach but also before and after. . . . To the extent that these factors did contribute to plaintiff's business plans, the court concludes that the conservative growth and profitability percentages applied by Dr. Kaplan compensate for them.

59 Fed. Cl. 338, 348 (2004), *aff'd*, 125 Fed. App'x 1013 (Fed. Cir. 2005). Dr. Kaplan employed the same approach to his damages analysis in this case as he did in *Commercial Federal*. Dr. Kaplan's approach accounted for the economic conditions that the Government argues caused an adverse effect on first Federal's ability to generate increased assets and earnings.

Dr. Kaplan proved himself to be a knowledgeable, thorough, and credible witness. His demeanor through 3½ days of detailed direct examination and 2 days of vigorous (not to say hostile) cross-examination was calm, business-like, confident, and careful. As stated earlier, the Court found Dr. Kaplan's testimony regarding the amount of profits First Federal would have earned on the assets it was forced to forego as a result of the breach to be sound and reliable. As more fully set forth in subsequent sections of this opinion, the Court also found Dr. Kaplan's testimony regarding the other elements of plaintiff's claimed damages (with one minor exception) to be sound and reliable.

Taking its history of successful asset growth into consideration, First Federal planned for $700 million in asset growth in 1989. PX 364 at FR172244. Through the first half of the year, the Association was well on its way to reaching that target. First Federal then slowed, and eventually stopped, its asset growth because it had become evident that Section 6.10 of the Financing Agreement would be abrogated by FIRREA's new capital standards. First Federal achieved only $270 million of asset growth by the end of the year. But for the breach, First Federal would have achieved approximately $400 million in additional asset growth by the end of 1989, and the Association would have earned profits of approximately $26.061 million on those foregone assets between 1990 and 1997.

C. <u>Foreseeability</u>

As noted above, First Federal must also establish that its damages were foreseeable. *Cal. Fed. Bank*, 395 F.3d at 1267. Foreseeability "requires only reason to foresee, not *actual foresight*. It does not require that the defendant . . . should have promised either impliedly or expressly to pay therefor in case of breach." *Anchor Sav. Bank., F.S.B. v. United States*, 59 Fed. Cl. 126, 146 (2003) (quoting 11 CORBIN ON CONTRACTS § 1009 at 66 (Interim ed. 2002)) (emphasis in original). "It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in contemplation of the parties at the time they made the contract." *Id.*

The Government had reason to foresee lost profits as a probable result of its breach of Section 6.10. *See Chain Belt*, 127 Ct. Cl. at 59, 115 F. Supp. at 715 (quoting RESTATEMENT (FIRST) OF CONTRACTS § 330); *see also Globe Savings Bank,* 65 Fed. Cl. at 348. Section 6.10 of the Financing Agreement allowed First Federal to conduct its operations in accordance with capital requirements much lower than those then applicable to healthy thrifts. Section 6.10 enabled First Federal to achieve increasing earnings and asset growth. The lower capital standards of Section 6.10 were reasonably understood to be critical to maintaining the level of First Federal's profitable assets. Therefore, it was reasonably foreseeable that breaching Section 6.10, by requiring First Federal to comply with FIRREA's stricter capital standards, would cause First Federal to curtail growth of profitable assets and thereby lose profits it would otherwise have realized.

The Government argues that there was no evidence that the parties foresaw in 1986 that First Federal would set a goal for growth in 1989 of 13 percent. *See* DX 513 at FR439437 ("During 1989, the Association's total assets are budgeted to grow to $6.1 billion from $5.4 billion at the end of 1988, representing a growth rate of 13%."). That growth rate was higher than the asset growth projections that First Federal had included in the capital plan set forth as Exhibit E to the 1986 Financing Agreement. *See* DX 2046 at 5. However, the parties did not view the growth projections set forth in Exhibit E as limitations. Tr. 1132:18-21, 1133:1-4, 1494:3-10 (Chaplin); 3508:6-21 (Palant). Indeed, the Government had reason in 1986 to foresee that First Federal might grow significantly in excess of the rates contained in Exhibit E. The Association's primary business strategy before the recapitalization was to increase its assets. That growth strategy is reflected in First Federal's business activities even during the Phoenix years. *See* Section I.B.2, *supra*. As Mr. Vigna had reported, First Federal's 1986 Business Plan, its last as a Phoenix institution, underscored the importance of growth to the Association: "In 1986 the Association will strive to achieve similar objectives as in 1985, but will allow the expansion of its core businesses to be of paramount importance by seeking a balance between long-term growth and near-term profitability." DX 168 (1986 Bus. Plan) at FR172065; PX 562 at FLT0030037; *see* Tr. 393:16-395:21 (Vigna); Tr. 1109:8-1110:2 (Chaplin). Mr. Vigna was aware that even while it was a Phoenix institution, First Federal had set "ambitious asset and liability origination goals." PX 562 at FLT 0030038; Tr. 396:1-397:4 (Vigna). Mr. Connell highlighted the fact that in 1985, First Federal had been "extremely profitable with respect to its new business." PX 14 at WOT7240052. Mr. Connell credited First Federal's success to the Association's management, which had "analyzed and initiated many new ideas so that it may compete successfully in the financial services industry." *Id.* at WOT7240053. Thus, at the time the Financing Agreement was entered into, it was reasonably foreseeable that First Federal would seek to achieve asset growth on the order of 13 percent by 1989 and that the Government's abrogation of Section 6.10 would cause First Federal to fall well short of that goal and to suffer substantial lost earnings and profits in 1990 and beyond as a result.

D. Reasonable Certainty

The measure of First Federal's damages "must be reasonably certain." *Cal. Fed. Bank*, 395 F.3d at 1267. However, if "'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'" *Id.* (quoting *Glendale Fed. Bank, F.S.B. v. United States,* 378 F.3d 1308, 1313 (Fed. Cir. 2004) (quoting *Locke v. United States*, 151 Ct. Cl. 262, 267, 283 F.2d 521, 524 (Ct. Cl. 1960))). "Lost profits, once established, need not be proven with complete precision. The 'reasonable certainty' test allows some flexibility." *LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64, 88 (1999), *aff'd in part, vacated in part, and remanded*, 317 F.3d 1363 (Fed. Cir. 2003). The RESTATEMENT (SECOND) OF CONTRACTS states that the reasonable certainty requirement does not mean

> that the injured party is barred from recovery unless he establishes the total amount of his loss. It merely excludes those elements of loss that cannot be proved with reasonable certainty. . . . Doubts are generally resolved against the party in breach.

> A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred. . . . Damages need not be calculable with mathematical accuracy and are often at best approximate.

*Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 352, cmt. a).

In cases such as this one, two elements must be established in order to prove lost profits with reasonable certainty: (1) the estimated reduction in the amount of profitable assets caused by the breach; and (2) the appropriate average return, based on comparable historical results, that would have been earned on such lost assets. *Chain Belt*, 127 Ct. Cl. at 64-66, 115 F. Supp. at 718-19. As set forth in Section I.B.4, *supra*, Dr. Kaplan undertook to calculate those elements in determining First Federal's lost profits. Necessarily, Dr. Kaplan was unable to establish lost profits with mathematical certainty. He was required to opine on what would have happened in a world that never was. *See Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001) ("problems . . . establishing lost profits – [*i.e.*,] establishing what might have been – are well recognized"). Nonetheless, Dr. Kaplan's testimony and analysis, together with other contemporaneous evidence of what First Federal had projected in terms of growth of assets and income in the non-breach world, constituted a sufficient and sound basis for the Court to make a "fair and reasonable approximation" of First Federal's lost profits caused by the Government's breach. *See Bluebonnet Sav. Bank F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001). Having done so, the Court holds that First Federal has established with reasonable certainty the amount of lost profits ($26.061 million) over the period 1990-1997 attributable to First Federal's having foregone asset growth in the amount of approximately $400 million in 1989 as a result of the Government's breach of Section 6.10.

## II. First Federal's Inability to Acquire Monroe and Its $517 Million In Assets Was Caused by the Government's Breach of Section 6.10 of the Financing Agreement, and That Breach Caused First Federal to Incur Damages in the Amount of $56.137 Million

As more fully discussed below, because FIRREA increased the tangible capital requirements imposed upon thrifts above the amount required of First Federal under Section 6.10 of the Financing Agreement, the Government refused to approve the merger of First Federal and Monroe. The absence of regulatory approval prevented First Federal from adding to its balance sheet Monroe's approximately $517 million in assets. The Government argues that the breach was not the but-for cause of First Federal's failure to acquire Monroe. Further, the Government argues that it was not foreseeable that First Federal would seek to grow by acquiring other thrifts. Finally, the Government argues that First Federal did not establish the amount of damages due to its inability to acquire Monroe with reasonable certainty.

A. Causation

Judge Merow held that "imposition of regulatory capital requirements contrary to those specified in the 1986 Financing Agreement was a breach." *First Federal I*, 58 Fed. Cl. at 160. Judge Merow, however, reserved decision on "whether the failure to approve the Monroe merger application breached the 1986 Financing Agreement." *Id.* at 163.

1. Section 6.10 of the Financing Agreement Applied to a Merger Application by First Federal

The Financing Agreement allowed First Federal to operate as a normal, fully capitalized institution, provided that it maintained the net worth ratios (*i.e.*, the ratios of net worth to total liabilities) set forth in Section 6.10, which were substituted for the net worth ratios required under 12 C.F.R. § 563.13 (1986). *See* Tr. 138:5-139:3 (Borshoff), 428:10-12 (Vigna), 5040:22-5041:8 (Guttentag). In fact, the central purpose of the Financing Agreement was to give First Federal the opportunity to develop a track record as a growing and profitable thrift institution in order to successfully access the public equity markets. *See* PX 14 (Issue Memorandum).

The Financing Agreement was conceived and executed in the context of the regulatory environment existing in 1986. At that time, the capital requirements of 12 C.F.R. § 563.13 (1986) constituted the gauge by which the FHLBB, the operating head of the FSLIC, judged the financial condition of insured institutions. 47 Fed. Reg. 39661, 39662 (Sep. 9, 1982); *see also* 50 Fed. Reg. 6891, 6892 (Feb. 19, 1985); 49 Fed. Reg. 47,499, 47,500 (Dec. 5, 1984). Notably, 12 C.F.R. § 563.13 was the standard for measuring the capital adequacy of a potential merger between two mutual savings associations both at the time of the execution of the Financing Agreement, as well as the time of the submission of the Monroe merger application. *See* 12 C.F.R. § 546.2(h)(1)(ii)(xii) (1986) ("[I]n calculating whether the net worth of the resulting association will at least equal the amount required under § 563.13(b), the Principal Supervisory Agent may exclude scheduled items which will be acquired in the merger and the amount of either the net-worth deficiency or the liabilities . . . of the acquired association at the date of merger."); 12 C.F.R. § 563.22(e)(1)(xii) (1986) (same); 12 C.F.R. § 546.2(h)(1)(ii)(xii) (1989) ("[I]n calculating whether the regulatory capital of the resulting association will at least equal the amount required under § 563.13(b), the Principal Supervisory Agent may exclude scheduled items which will be acquired in the merger and the amount of either the regulatory capital deficiency or the liabilities . . . of the acquired association at the date of merger."); 12 C.F.R. § 563.22(e)(1)(xii) (1989) (same).

Because the parties were aware in 1986 of the broad applicability of 12 C.F.R. § 563.13, and because Section 6.10 substituted its net worth ratios for those required under 12 C.F.R. § 563.13, the Court concludes that the parties reasonably understood that First Federal, by satisfying the requirements of Section 6.10, would satisfy the capital requirements necessary in order to undertake a merger. Obviously, compliance with Section 6.10 was not itself a sufficient condition for approval of a merger application. That is the purport of Section 6.09 of the

Financing Agreement, which provided that all other FSLIC regulations remained applicable to First Federal,[13] PX 17 at WOF0202004. However, Section 6.10 stated, "The amount of net worth required under 12 C.F.R. § 563.13 (1986) or any successor regulation *shall not be required* of First Federal." PX 17 at WOF0202005 (emphasis added). The fact that the scope of Section 6.10's applicability was not limited is strong evidence that the parties understood that there would be no other capital requirements that the Association would need to satisfy in order to be eligible to merge with another institution. In addition, the Financing Agreement appears to have contemplated the possibility of a merger involving First Federal and that, in such event, the Financing Agreement would be applicable to the surviving entity. The Agreement, in Section 1.01.20, defined "First Federal" to include "any successor to First Federal," *id*. at WOF0201956, and provided in Section 8.06 that the obligations and benefits of the Agreement would be binding upon First Federal and its "successors and assigns." *Id.* WOF0202008-09. The evidence supported Mr. Borshoff's testimony that Section 6.10 was the "yardstick" or "benchmark" by which First Federal was to be measured and, if compliant, the Association would be treated as a "complete, healthy institution." Tr. 138:14-139:3 (Borshoff); *see* Tr. 422:8-10; 428:10-12 (Vigna).

The Government's own treatment of the Monroe application before the enactment of FIRREA confirms that it viewed Section 6.10 as the standard by which First Federal's capital adequacy would be measured for purposes of a proposed merger. When reviewing the Monroe merger application prior to the enactment of FIRREA, the FHLB-NY determined First Federal's capital adequacy under the standards of Section 6.10. It was on the basis of First Federal's compliance with Section 6.10's capital requirements that the FHLB-NY recommended approval of the Monroe merger. *See* PX 519, PX 520, PX 521. Similarly, the FDIC selected First Federal's bid for Monroe in light of Section 6.10, after previously rejecting First Federal's bid when it had been unaware of Section 6.10. Tr. 314:8-316:4; 319:23-24 (Borshoff).

Finally, the evidence showed that on the basis of Section 6.10, the New York and Washington, D.C., offices of the FHLBB approved First Federal's pre-FIRREA application to acquire a branch of Anchor Savings Bank, a transaction subject to the same regulatory standards as the Monroe application. *See* 12 C.F.R. §§ 563.22, 571.5 (1989). The Anchor Savings Bank acquisition was approved in April 1989, before FIRREA was enacted. *See* PX 591 (FHLB-NY Memorandum of April 27, 1989) at WOL4362014. The FHLB-NY recommended approving

---

[13] Section 6.09 specified that:

> [d]uring the term of this Agreement, First Federal will comply with any and all applicable statutes, regulations, or order of, or any restriction imposed by, the United States of America or any state, municipality, or other political subdivision, or any agency thereof, relating to the conduct of its business or the ownership of its properties . . . .

PX 17 at WOF0202004.

First Federal's application on the basis of the net worth ratios in Section 6.10 of the Financing Agreement. *Id.* ("The increase in liabilities will not materially affect First Federal's ability to comply with the capital requirements of the 1986 Financing Agreement.").

2. The Government Failed to Approve the Monroe Merger Application Because First Federal Failed to Meet FIRREA's Capital Requirements

During the fall of 1989, the Washington, D.C., office of the OTS ("OTS-Washington"), successor to the FHLBB, recommended against approving the Monroe merger application because First Federal did not meet the tangible capital requirements of FIRREA. In a September 14, 1989 memorandum to OTS Director Danny Wall, Alvin Smuzynski, the Acting Deputy Director, recommended against approving First Federal's Monroe merger application. *See* PX 512 (OTS Memorandum of September 14, 1989) at WOL4570008. Mr. Smuzynski wrote:

> Transaction: First [Federal] has assets of $5.6 billion, RAP capital of 2.4% of assets, and negative tangible capital of 0.1%. The institution proposes to acquire a failing savings bank, with FDIC assistance. However, the transaction will increase First [Federal's] negative tangible capital (adverse impact). First [Federal] hopes to recapitalize through a conversion in 1990.
>
> Policy Issue: Should we permit an institution, with negative tangible capital, to worsen its capital position?
>
> Staff recommendation: No.

PX 512 at WOL4570009.

Later in the memo, Mr. Smuzynski wrote: "Rochester is failing to meet the minimum capital requirements as required by the FIRREA. Should an institution that fails to meet the minimum tangible capital requirements on a pre-acquisition and post-acquisition basis be permitted to merge via purchase of another institution[?]" *Id.* at WOL4570011. It is evident from Mr. Smuzynski's memorandum that First Federal's failure to satisfy FIRREA's capital requirements, on a pre-acquisition and post-acquisition basis, was the reason that OTS's Acting Deputy Director recommended that First Federal's Monroe merger application be denied.

Eight days later, on September 22, 1989, officials of OTS-Washington and OTS-NY participated in a conference call concerning the Monroe merger application. Mr. Vigna said that OTS-NY supported the merger because it would benefit First Federal in that the Association would acquire a bank in its own market area, which would enable it to achieve economies of scale such as branch consolidation, elimination of senior staff and reduction in staff. PX 523 (OTS-NY Memorandum) at WOL4570006. Profits to be derived from the economies of scale were estimated to reach more than $5 million during the first year after the merger. *Id.* Mr. Vigna noted that although the acquisition would reduce First Federal's net worth ratios, OTS-NY

believed that the resulting bank would be far stronger. Furthermore, First Federal's ability to sell stock would be enhanced by the transaction. *Id.* In response:

> OTS Washington didn't appear to be impressed with our conclusions[,] but while they did not refute our conclusions they interjected a number of new obstacles[,] namely entrance and exit fees *and the fact that as of January 1990 the subject merger, as proposed, could not be approved.* They used Title III, Section 5(t)(6)(A)(IV) and (V) [the provisions of FIRREA requiring the Director of OTS to require that any increase in assets be accompanied by an increase in tangible and risk-based capital] for the latter and questioned if the merger would be as financially beneficial if the fees were factored into the transaction.

PX 523 (OTS-NY Memorandum) at WOL4570006 (emphasis added); *see also* Tr. 501:2-502:12 (Vigna).

Though the OTS-Washington officials mentioned entrance and exit fees in conjunction with the Monroe merger application, it was evident to the OTS-NY participants that OTS-Washington intended to deny the Monroe application because First Federal did not satisfy the capital requirements of FIRREA. *See* PX 523 at WOL4570007 ("We will get info on fees . . . and get back to Washington. However, I believe the deal is dead."). Later, First Federal was informed by Mr. Vigna that its merger application would not be approved because of FIRREA. Tr. 342:24-344:6; 1805:9-19 (Borshoff).

Pursuant to Section 6.10 of the 1986 Financing Agreement, "[t]he amount of net worth required under 12 C.F.R. § 563.13 (1986) or any successor regulation shall not be required of First Federal." PX 17 at WOF0202005**.** As set forth above, Section 6.10, not 12 C.F.R. § 563.13, governed the net worth requirements applicable to First Federal's Monroe merger application. Because OTS relied upon "regulatory capital requirements contrary to those specified in the 1986 Financing Agreement" as the basis for failing to approve First Federal's Monroe merger application, the Government breached the Financing Agreement. *See First Federal I*, 58 Fed. Cl. at 160.

3. <u>First Federal Established That the Government's Failure to Approve the Monroe Merger Application Caused First Federal to Incur Damages in the Amount of $56.137 Million</u>

First Federal claims that the Government's breach in failing to approve the Monroe merger caused the Association's failure to acquire Monroe and add approximately $517 million in assets to First Federal's balance sheet. First Federal's claimed damages attributable to the failure to approve the Monroe merger ($56.137 million) are comprised of $30.388 million in profits that First Federal claims it would have earned on Monroe's $517 million in assets plus Monroe's deposit franchise premium of $28.981 million, less $3.232 million, the insurance

premium that First Federal would have had to pay to the SAIF.[14] Tr. 2831:24-2832:3; 3163:18-3164:22; 3165:1-14 (Kaplan); PX 8000 at 71 (Lost Spread Income Plus Deposit Value From Denial of Monroe Merger). The Government argues that the failure to approve the Monroe merger was not the but-for cause of First Federal's claimed damages.

First Federal had been interested in a merger with Monroe since 1987. Tr. 297:24-298:10 (Borshoff); PX 184 at FR108620; *see also First Federal I*, 58 Fed. Cl. at 162. Though Monroe had some troubled assets on its books, it offered attractive potential returns. Tr. 2890:12-23 (Kaplan). Monroe was located in the same area as First Federal. A merger, therefore, offered opportunities for branch consolidation which would improve operating economies. Tr. 196:20-197:13; 298:11-300:8 (Borshoff); 1295:5-22 (Chaplin); 2894:14-2895:16 (Kaplan); PX 80 at FR229431-40. Monroe also had about $517 million in assets; a merger, therefore, offered the prospect of immediate asset growth. Tr. 298:11-300:8 (Borshoff). Monroe was also strategically important because the resulting additional deposits would give First Federal the second-highest market share in Rochester. Tr. 217:13-218:8 (Borshoff).

In the fall of 1988, First Federal performed a due diligence analysis of Monroe and concluded that a merger would present an "excellent risk-adjusted opportunity" if the FDIC were willing to provide $33 million in cash assistance to cover Monroe's projected loan losses. PX 359 at WOL4462345; Tr. 318:2-319:23 (Borshoff). First Federal discussed a potential Monroe merger with Mr. Vigna of the FHLB-NY, who said that the FDIC would likely accept the Association's bid. Tr. 316:17-317:20 (Borshoff). First Federal then submitted to the FDIC a bid for Monroe, which was accepted, subject to certain contingencies. Tr. 319:23-24 (Borshoff). First Federal and Monroe executed a merger agreement on December 23, 1988, subject to receiving the necessary regulatory approvals. DX 517 at WOL4570089.

On April 11, 1989, the FDIC formally advised First Federal that it had approved the Associations's application to acquire Monroe, PX 644; PX 356, contingent on First Federal's securing approval of the merger by the FHLBB and executing an Assistance Agreement with the FDIC. PX 644 at FR429791-92; Tr. 5242:9-5243:5 (Carron).

In late April 1989, First Federal concluded that the FDIC's first Draft Assistance Agreement was "unacceptable" because the "Agreement fails to acknowledge the Association's existing FSLIC Financing Agreement and the net worth provisions contained in Sections 6.10 thereof." *See* DX 610 (Minutes of the April 27, 1989 Board of Directors' Meeting) at FR233146; Tr. 1035 (Borshoff). In its May 1, 1989 proposed Draft Assistance Agreement, First Federal proposed adding recognition of the capital requirements of Section 6.10 back into the Agreement. PX 98; Tr. 3322 (Mullin). On May 16, 1989, the FDIC rejected First Federal's proposed changes. PX 99; PX 118 at FR055831; Tr. 3326-27 (Mullin). On June 21, 1989 Mr.

[14] After FIRREA was passed, the FSLIC insurance fund became the SAIF, which was administered by the FDIC. *See* Tr. 5458:6-11 (Carron).

Borshoff sent a letter to Nicholas Ketcha, FDIC Regional Director. PX 385. In the letter, Mr. Borshoff wrote that First Federal was concerned about the effects of delay. Mr. Borshoff stated:

> [D]espite our disappointment with the timetable for securing the necessary FDIC and FHLBB approval, and notwithstanding the uncertainties introduced by FIRREA, our Association is prepared to close the Monroe transaction in accordance with the terms of our initial bid. In willing [sic] to close on the initial terms, we believe that it is critical that all parties to this transaction, including the FHLBB, the FDIC, as well as the FSLIC, fully appreciate, acknowledge and accede to the understandings under which we are willing to proceed to close. These understandings must, at a minimum, extend to those assessments set forth in this letter, as well as the resulting alteration of the time line of the Association's capital plan. Without these acknowledged understandings by all concerned, we believe a decision to proceed with the Monroe transaction on the same terms under which our bid was accepted would be inappropriate.

PX 385 at WOL4761012. The "alteration of the time line of the Association's capital plan," was a reference to the time line for First Federal's conversion. In the Capital Plan that was part of the Financing Agreement, the conversion had been anticipated to occur by late 1989 or early 1990.[15] In his June 21, 1989 letter, Mr. Borshoff proposed that the conversion would occur sometime in 1992 at the earliest. *Id.* at WOL4761011. One of the "assessments set forth in this letter" was First Federal's understanding that Section 6.10 of the Financing Agreement would "remain controlling as to our Association and the resulting association following the merger of Monroe." PX 385 at WOL476 1011. The Association and the FDIC continued negotiations relating to the terms of an Assistance Agreement until the fall of 1989. Pl.'s Reply to Def.'s Proposed Findings of Fact at 31. However, First Federal and the FDIC did not reach agreement on an acceptable Assistance Agreement prior to First Federal's withdrawal of the Monroe merger application on November 14, 1989.

The Government alleges that during the fall of 1989 there were indicators that First Federal was not going to go forward with the Monroe merger. First, Mr. Andrew Shearer, a

---

[15] First Federal's Capital Plan, Exhibit E of the 1986 Financing Agreement, contemplated that First Federal would convert within 18 to 36 months of the recapitalization. PX 17 at WOF0202055. In May 1988, First Federal was informed by representatives of the chief accountant's office at the FHLBB that the Association would need to have three years' worth of audited Generally Accepted Accounting Principles ("GAAP") financial statements in order to undertake a standard conversion. PX 4 at FR001561-62; Tr. 178:16-180:1 (Borshoff); Tr. 1136:22-1137:15 (Chaplin). First Federal also confirmed with the regulators that the Association would be able to present audited GAAP financial statements only for periods following the August 1986 recapitalization, Tr. 1137:1-15 (Chaplin). Thus, First Federal could have converted in late 1989 or early 1990, which would have been consistent with the time line of the Association's capital plan.

member of the Board of Directors, reported at a September 26, 1989 meeting of First Federal's Strategic Planning Committee that the FDIC had "recently taken a strong position that it was necessary for any bidders of troubled institutions to be in a position to fully capitalize the acquisition with 6% capital." PX 120 at FR312461R; Tr. 4560:20-4561:10 (Sear), 4805:8-13 (Rochester). No evidence was proffered to show that the FDIC would have waived its capitalization requirement for First Federal. Tr. 5570:15-5571:6 (Carron). There was no indication that First Federal would have had the ability to capitalize the acquisition with six percent capital. In September 1989, the Association had RAP capital of 2.4 percent of assets, and negative tangible capital of 0.1 percent. *See* PX 512 at WOL4570011. Mr. Borshoff announced during the September 26 Strategic Planning Committee meeting that "he was aware of this recent policy statement and had discussed the same with [Mr. Vigna] and had considered the question as to whether or not it was appropriate at this time to withdraw the application in light of the policy issues that were being presented." PX 120 at FR312461R. As discussed at pages 31-32, *infra*, however, that the FDIC would not have waived its more-stringent standards of capitalization for First Federal does not mean that the breach did not prevent First Federal from acquiring Monroe.

At an October 12, 1989 Officers Management Committee meeting, Mr. Sear stated that First Federal was seriously reconsidering the Monroe transaction because "losses incurred by Monroe over the last year are troublesome, and . . . the timing of the merger is bad, because we want to realize improved earnings before going to the capital market."[16] PX 134AA at FR233241; Tr. 4563:7-4564:3, 4627:9-4628:13 (Sear); Tr. 336:1-22; 337:16-338:8 (Borshoff). However, at a meeting two weeks later, First Federal's Board of Directors authorized a 30-day extension of the merger agreement with Monroe. PX 103K at FR233261-62; Tr. 340:23-341:5

---

[16] Mr. Sear's statements relating to the reasons First Federal was "seriously reconsidering" the Monroe transaction referred to Monroe's financial situation and did not refer to the likelihood that the merger application would be turned down by the regulators. Mr. Borshoff testified that this was because management wished to lay the groundwork for the possible withdrawal of the Monroe merger application, which, from the point of view of the morale of bank officers, would be preferable to a denial of the application by regulatory authorities. Tr. 338:9-339:7 (Borshoff). Mr. Chaplin testified that he believed that Mr. Sear's statements were intended to put a "happy spin on the fact that we already had doubts that the application was going to be approved. We were not anxious to tell the employees that we weren't going to have an approved application." Tr. 1695:24-1696:2. Mr. Sear, called as a witness by defendant, testified that he presented comprehensively the reasons that First Federal was reconsidering the merger, adding that he would not have given "phony reasons" for the reconsideration. Tr. 4564:4-4565:1 (Sear). While the Court credits Mr. Sear's testimony that he would not have given "phony reasons," because of the latter's evident animus toward his former colleagues in the management of First Federal stemming from the circumstances of the termination of Mr. Sear's employment with the Association, the Court also credits the testimony of Messrs. Borshoff and Chaplin to the degree their testimony is inconsistent with that of Mr. Sear.

(Borshoff). Approximately three weeks later, on November 14, 1989, First Federal submitted a letter withdrawing its application for FHLBB approval of the Monroe merger. PX 352.

The Government argues that First Federal failed to demonstrate that, but for the breach, it would have consummated the merger with Monroe for four reasons: (1) it never reached an agreement with the FDIC on the terms of the proposed assistance agreement; (2) it failed to establish that OTS would have approved its application to merge with Monroe in the absence of the breach; (3) because the merger would delay its conversion, First Federal would have been required to seek a two-year extension of its obligation to convert; and (4) it withdrew its application for business reasons and regulatory roadblocks unrelated to the breach. Defendant's Proposed Post-Trial Conclusions of Law ("DPCL") at 15-19.

It is unnecessary, however, for the Government's breach to have been the but-for cause of First Federal's failure to consummate the Monroe merger. Rather, as noted in Section I.B, *supra*, First Federal must establish that FIRREA was a substantial factor in causing the demise of First Federal's acquisition of Monroe. In this case, however, the Court finds both that the Government's breach was a but-for cause *and* that the Government's breach was a substantial factor in preventing the merger. While it is true that First Federal never executed a final assistance agreement with the FDIC, it is also the case that the FDIC sought to impose a more onerous capitalization requirement than did Section 6.10. FDIC's conduct in that regard constituted a breach of the Financing Agreement. *See, e.g.*, *Fifth Third Bank v. United States*, 71 Fed. Cl. 56, 70-71 (2006) (had the FDIC required trust to increase its tangible capital level relative to its goodwill, "it also would have constituted a breach of contract by the Government. The breaching activity would have occurred through a different mechanism – the regulator's choice to eliminate the promised treatment of goodwill – rather than a mandate from Congress eliminating the treatment of goodwill.").

Likewise, although the Government asserts that there were "various non-breach policy issues" that would have prevented OTS from approving the Monroe merger, Def.'s Proposed Conclusions of Law (docket entry 162) at 17, it does not elucidate what those policy issues were. In fact, the testimony and documents to which the Government cites confirm that the regulatory authorities who objected to the merger did so because First Federal had insufficient capital as measured by FIRREA or some other standard more onerous than that provided for in the Financing Agreement. *See, e.g.*, Tr. 4805:3-4 (Rochester) ("Rochester had very low tangible capital."); PX 120 at FR312461R ("Mr. Shearer noted that the FDIC had recently taken a strong position that it was necessary for any bidders of troubled institutions to be in a position to fully capitalize the acquisition with 6% capital."); PX 475 at PFR0081168 ("However, First Federal is clearly in a precarious position in terms of its low capitalization, and the political and regulatory issues that attend the acquisition of an insolvent FDIC-insured savings bank by a relatively weak FSLIC-insured thrift should not be minimized.").[17]

---

[17] The Government also alleges that PX 519, PX 520, and PX 521 implicate non-breach issues with the merger. Each of these documents is an internal FHLBB memo written prior to

While First Federal did request a two-year extension of its obligation to convert, there is no evidence that this request prevented it from merging with Monroe. In fact, by late 1989, market conditions for conversions were sufficiently poor that First Federal could only expect to raise between $75 million and $110 million, far short of its goal of $150 million. PX 007 at FR000614. Merrill Lynch Pierce Fenner & Smith ("Merrill Lynch") projected that the latter half of 1991 would be a more favorable time in which to convert. *Id.* at FR000615. In addition, as discussed above, although First Federal stated that it was reconsidering its purchase of Monroe, the evidence is very strong that it withdrew its application because, in light of FIRREA's capitalization requirements, the application was going to be rejected. The Government's breach of Section 6.10 caused First Federal's failure to acquire Monroe, without regard to whether one analyzes the causation issue under the "but-for" or "substantial factor" standard.

B. Foreseeability

As discussed in Section I.C, *supra*, foreseeability requires reason to foresee; it does not require that the defendant have actually foreseen the consequences of its breach. When the Financing Agreement was executed, the Government had reason to foresee that First Federal would seek to achieve asset growth by merger, acquiring another institution like Monroe. First Federal had effectively managed troubled financial institutions that were merged into the Association during the Phoenix years. Tr. 122:2-123:23 (Borshoff); 1082:12-1083:18 (Chaplin); 376:18-23; 380:17-21 (Vigna). In 1986, the year that the Financing Agreement was executed, Mr. Vigna noted that First Federal had a goal of generating off-balance-sheet assets. PX 562 at FLT0030037. In addition, the Financing Agreement contemplated the possibility of First Federal's merging with another institution. *See* pp. 24-25, *supra*. And, as was discussed in Section II.A.1, *supra*, the parties intended Section 6.10 of the Financing Agreement to be the measure of capital adequacy by which First Federal was to be deemed qualified to merge with another institution.

C. Reasonable Certainty

First Federal asserts that if the acquisition of Monroe had been approved, the Association would, by reason of the acquisition, have increased its tangible assets by approximately $517 million on October 1, 1989. Tr. 299:4-5 (Borshoff), 2912:13-15 (Kaplan), 3147:3-6 (Kaplan). As he did in calculating lost profits on the foregone assets, Dr. Kaplan applied a profitability parameter to the Monroe assets. Except for the first year, Dr. Kaplan calculated a profit parameter of 87 basis points to be applied to the Monroe assets. Tr. 2919:11-19 (Kaplan). Dr. Kaplan used a 23-basis-points parameter for 1990, which, for the purpose of calculating

---

the enactment of FIRREA, and each memo recommends approval of the merger between First Federal and Monroe.

damages, is the first year following the merger.[18] This 87-basis-point factor, was not, however, derived by calculating the spread between the Association's average highest-cost source of funds and its lowest average return, as was the basis-point factor used to calculate profits First Federal would have earned on the $400 million in assets that the Association had foregone in 1989. Rather, the 87-basis-point factor for the Monroe assets was based on First Federal's analysis of the Monroe portfolio. In its analysis, First Federal projected Monroe's net income for the five years following its acquisition, then calculated that net income as a percentage of assets. Dr. Kaplan then averaged the result for years two through five to arrive at the 87-basis-point factor.

Although Dr. Kaplan's testimony was necessarily based upon a projection of what First Federal's profits on the Monroe acquisition would have been, that projection was based on Monroe's historic performance. The projection was also based on current data supplied to First Federal by Monroe. PX 656 at 1; Tr. 1335:24-1336:2 (Chaplin). First Federal was familiar with Monroe when it proposed the merger: it had been evaluating a potential acquisition of Monroe since 1987. Tr. 297:20-300:8 (Borshoff). Furthermore, Dr. Kaplan's firm, Kaplan, Smith & Associates, Inc. ("Kaplan Smith"), had previously analyzed a potential acquisition of Monroe on behalf of First Federal, and believed that the acquisition of Monroe was of "vital interest to First Federal," while recognizing that First Federal had low capitalization. PX 475; Tr. 301:4-303:6. Kaplan Smith had also performed a complete review of Monroe and its operations in 1986, as Monroe was looking for a merger partner, and thereby gained a detailed familiarity with its financial situation. Tr. 2773:23-2774:14 (Kaplan). Although Kaplan Smith's analyses were sufficiently complex that they were done by teams of persons within the firm, Dr. Kaplan had some personal involvement in each analysis. Tr. 2775:2-10 (Kaplan). Thus, Dr. Kaplan's projection was founded upon Monroe's historic track record, as well as an intimate knowledge, both by Dr. Kaplan and by First Federal, of Monroe. The Court is also mindful that "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman*, 317 F.3d at 1374. "[T]he court 'believes this is a case in which' the court can properly 'draw reasonable inferences based upon the evidence' about the likelihood that plaintiff would have earned profits in the amounts specified but for the breach." *Commercial Fed. Bank,*

---

[18] Dr. Kaplan calculated the 23-basis-point parameter as follows: First Federal's June 1989 analysis forecast a return on the Monroe assets of two basis points. *See* PX 656 at FR055770. Dr. Kaplan testified that absent the breach, the Monroe transaction would have been approved on October 1, 1989. Tr. 3160:14-19. Therefore, First Federal would have taken on the $517 million in Monroe assets in the last quarter of 1989. The first four quarters following the Monroe transaction were Quarter 4 of 1989 until Quarter 3 of 1990, a period during which First Federal would have received a return of two basis points on the Monroe assets. Dr. Kaplan, however, established January 1, 1990 as the starting date for his damages calculation. Therefore, the first year of Dr. Kaplan's damages calculation included three quarters when First Federal would have received return of two basis points on the Monroe assets, and one quarter when First Federal would have earned a return of 87 basis points on the Monroe assets. Averaging three quarters of a two basis point return and one quarter of an 87-basis-point return yields a profitability parameter of 23 basis points for 1990. *See* Tr. 3162:18-3163:17 (Kaplan).

*F.S.B. v. United States*, 59 Fed. Cl. 338, 351 (2004) (quoting *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1329 (2002)).

In performing his calculations, Dr. Kaplan relied upon First Federal's June 27, 1989 updated Monroe analysis. Tr. 2916:6-19 (Kaplan); PX 656 (June Monroe update) at FR055770; Demo Ex. 8000 (Kaplan Demo Bk.) at 22. The June analysis was an update of the analysis performed by First Federal in October 1988. Dr. Kaplan testified that the October 1988 analysis, performed well before the enactment of FIRREA and the Government's breach, was a complete and thorough analysis. Tr. 2918:10-2919:10 (Kaplan) ("Q: Now, is the type of analysis performed in the Fall of '88 and then updated here in June of '89 the type of analysis that you rely on in doing your work outside this courtroom? [Kaplan]: "Well, if somebody had done this in another situation at another institution, this would certainly be the kind of thing I'd be looking for. But I would go further. When I reviewed the October '88 analysis; that is, the kind of analysis we would perform, and we did perform, inside our institution on behalf of our clients. So I think it is very much on target, as far as the scope and coverage of it."). The calculations of net income as a percentage of assets for the June update is consistent with equivalent calculations for the October 1988 analysis of Monroe (96 basis points) and the March update of the Monroe analysis (85 basis points).[19] Tr. 5882:5-5886:22 (Kaplan).

Though the June 1989 analysis did not address the profitability of the Monroe assets in the sixth and seventh years following the transaction, Dr. Kaplan continued to use the 87-basis-point parameter because by that time, the Monroe assets would have become part of First Federal, and, as was addressed in Section I.B.4, *supra*, 87 basis points was a conservative profitability parameter for First Federal's assets. Tr. 4064:23-4065:22 (Kaplan). Thus, on an annual basis, First Federal asserts that its lost profits due to the failure to acquire Monroe were as follows:

| | | |
|---|---|---|
| 1990 | $ | 1,202,000 |
| 1991 | $ | 4,498,000 |
| 1992 | $ | 4,498,000 |
| 1993 | $ | 4,512,000 |
| 1994 | $ | 4,695,000 |
| 1995 | $ | 4,929,000 |
| 1996 | $ | 5,176,000 |
| 1997 | $ | 878,000 |

[19] The June update was based on a flat interest rate scenario. However, interest rates actually fell significantly. The June update therefore turned out to be conservative. Tr. 2920:3-20 (Kaplan).

Total $ 30,388,000

Tr. 3163:18-3164:20 (Kaplan). As with the amount of foregone assets discussed in Section I, *supra*, the lost assets from Monroe were held constant until 1993, when Dr. Kaplan used a growth rate of 5 percent. *See* p. 19, *supra*. In keeping with his conservative methodology, although the Monroe assets were lost in 1989, Dr. Kaplan did not begin the calculation of lost spread income on these assets until 1990. Tr. 2852:1-22 (Kaplan).

From this $30.388 million, Dr. Kaplan deducted the $3.2 million SAIF premium (an insurance premium the entire industry paid in 1996). The SAIF premium was calculated by applying a rate of 66 basis points to Monroe's deposit base. Tr. 3165:1-14 (Kaplan). Subtracting the SAIF premium of $3.232 million from the $30.388 million yields $27.156 million.

As noted above, Dr. Kaplan's lost profits calculations were based on detailed and extensive contemporaneous analyses performed by First Federal. As part of their agreement to merge, First Federal received information from Monroe monthly, Tr. 1335:24-1336:2 (Chaplin), and, employing Sendero software, used that historic data to update its analyses. *See* PX 565 at FR055768. The updates were performed in the ordinary course of business, not in contemplation of litigation – First Federal performed an initial analysis in October 1988 and updated that analysis in March and June 1989, before both the passage of FIRREA and the Government's breach. Dr. Kaplan testified that First Federal's analyses were the type that he would have performed on behalf of his consulting clients. Tr. 2919:6-10 (Kaplan). Still, in order to account for economic uncertainties, Dr. Kaplan employed a more conservative growth assumption than that used by First Federal. Whereas First Federal assumed that the assets from Monroe would grow, Dr. Kaplan assumed no growth through 1993, followed by growth at a rate of 5 percent. Tr. 5288-5289 (Carron). Therefore, First Federal asserts, Dr. Kaplan's conclusion represents a "fair and reasonable approximation" of the profits lost as a result of First Federal being prevented from acquiring Monroe. *See Commercial Fed. Bank*, 59 Fed. Cl. at 351.

The Government disputes that First Federal established lost profits on the Monroe acquisition with reasonable certainty. The Government faults Dr. Kaplan for relying on the Association's analyses of Monroe in October 1988, March 1989 and, in particular, June 1989. As noted above, in evaluating its possible acquisition of Monroe, First Federal analyzed Monroe's financial condition and made forecasts of Monroe's expected future performance in October 1988. PX 359. The forecasts extended over a five-year period and employed Sendero software to project earnings on Monroe's assets under a number of interest rate scenarios. The earnings forecasts, which anticipated converting Monroe's annual losses into consistent profitability, were dependent upon numerous assumptions regarding, among other factors, the direction of interest rates, the effect of rates on Monroe's assets and liabilities, credit loss expectation, and expense reductions. *Id.* at WOL4462355-75; Tr. 5255 (Carron). Dr. Kaplan acknowledged that he did not audit the data entered into the Sendero analyses. Tr. 5938 (Kaplan). However, Dr. Kaplan maintained that his review of the results of the Association's several analyses confirmed that they were reasonable and consistent. Tr. 3942 (Kaplan).

First Federal intended its June 1989 Monroe analysis to be an updated forecast of results from a merger with Monroe, based on Monroe's financial information through April 1989. PX 656 at 1. Dr. Kaplan based his damages calculation on First Federal's most recent update of its analysis of Monroe, which was done in June 1989. Tr. 3939, 3957 (Kaplan); PX 8000 at 22. However, Dr. Carron observed that the results depicted in the June 1989 document were not arrived at using the Sendero model underlying the October 1988 and March 1989 analyses. Tr. 5265 (Carron). Dr. Kaplan and Mr. Chaplin acknowledged this fact during First Federal's rebuttal case. Tr. 5692 (Chaplin), 5944 (Kaplan). When asked why the interest margin in the June analysis grows at the rate of exactly 3 percent each year, Mr. Chaplin explained that the June analysis

> was a snapshot to be given to the Board to affirm the transaction. And we had taken the actual interest margin that we were receiving for Monroe, and rather than resimulate it using Sendero which – and the large amount of balance sheet growth that was in there would have caused the income to be significantly high. So instead, we just utilized a 3 percent increase in margin from their current run rate.

Tr. 5692 (Chaplin). Therefore, according to the Government, the June 1989 interest margin number is "just a number that's been dropped in here to illustrate the implications" of achieving that interest margin on the bottom line results of the merger. Tr. 5274 (Carron). The Government noted that although such an analysis may be useful for certain purposes, "it's not a forecast" and there is no "value in these numbers in terms of telling you what a reliable forecast of the spread would be." Tr. 5282-83 (Carron).

First Federal responds that the October 1988 analysis was a thorough analysis of the type that Kaplan Smith would perform and that the results of that analysis and the March and June 1989 updates were all consistent with each other. First Federal also notes that the results of the analyses were consistent with the movement of interest rates at the time. Tr. 5884:23-5886:23 (Kaplan). In fact, First Federal shows that adjusting the figures from the June update for the corrections identified by Mr. Chaplin at trial, the 87-basis-point factor used by Dr. Kaplan understates the lost income. Tr. 5888:2-5890:1 (Kaplan).

The Government argues that, unlike the October 1988 and March 1989 forecasts, the June 1989 analysis projected first- and second-year interest margins of 2.12 percent and 2.15 percent, respectively, which were wholly inconsistent with Monroe's current yield of 1.55 percent.[20] Tr. 5270-71 (Carron); PX 656 FR0055770-71. Further, the margins were inconsistent with First Federal's predictions of its own interest margin for 1989, which was 1.89 percent in May 1989. PX 676 at FR198944. The Government contends that the amount of increase in the interest margin between the March 1989 analysis and the June 1989 analysis, which was approximately

[20] As explained earlier, one basis point is the equivalent of one-hundredth of 1 percent. *See* note 11, *supra*. Thus, for example, 1.55 percent is the equivalent of 155 basis points.

50 basis points and $34 million during the first year, undermines the June 1989 interest margin assumption. Tr. 5271-72 (Carron); *compare* PX 656 at FR0055770 ($12,135,000) *with* PX 654 at TR0001417 ($9,342,000). The March analysis was based on February 1989 figures, and the June 1989 analysis was based upon April 1989 figures. *See* PX 654 at 2; PX 656 at 1. During the two months that ensued between the figures, however, Monroe's yield actually declined five basis points, rather than improving dramatically as would be expected in order to support a 50-basis-point increase in assumed interest margin. Tr. 5272-73 (Carron); *compare* PX 656 at FR0055771 (1.55 percent) *with* PX 654 at TR001416 (1.60 percent).

First Federal responds that Mr. Chaplin harmonized the projected yield in the June 1989 analysis (2.12 percent for Year 1) with the interest margin actually earned by Monroe through August 1989. The discrepancy between the interest margin in the March 1989 and June 1989 analyses can largely be explained by the fact that the June analysis, as First Federal points out, includes income of 10.5 percent on the $33 million of FDIC assistance ($3,465,000), while the March analysis does not. Tr. 5808:21-5815:25 (Chaplin).

The Government next points out that several numbers in the June 1989 analysis, including the key variable that Dr. Kaplan used for income, are internally inconsistent. Tr. 5280-81 (Carron). One row of the June 1989 analysis assumes $200 million in asset growth over five years; another row does not. Tr. 5278-81 (Carron); DX 2046 at 12. Dr. Kaplan's model, however, is inconsistent with both assumptions, in that it assumes a constant level of assets and liabilities for a number of years, and then growth afterward. Tr. 5288-89 (Carron). The Government contends that, because he assumed positive growth, Dr. Kaplan's inconsistent growth assumptions undermine not only the amount of assets to which he applies his 87-basis-point profit parameter, but the reasonableness of the 87-basis-point parameter itself. Tr. 5289-90 (Carron); Tr. 2514-15 (Chaplin).

Mr. Chaplin testified that errors in the June 1989 analysis do not affect the accuracy of the projected interest margin and costs. Tr. 5697:11-5700:1 (Chaplin). The dollar amounts for projected interest margin, expenses and net income in the June 1989 analysis are correct, but some of the ratios are incorrect. Dr. Kaplan explained that the error causes the net income ratios to be understated because the denominators used in making the calculations are larger than they should be. Tr. 5888:2-5889:22 (Kaplan). Therefore, First Federal maintains that the error is not material, and states that the June 1989 analysis actually provides a conservative projection of the Monroe merger results. *Id.*

Finally, the Government points out that the June 1989 analysis illustrates that returns on Monroe were projected to decline in years two through five. Tr. 5254-55, 5260-61 (Carron). The Government argues that, even assuming the returns were correct for years two through five, there is no economic basis for averaging them, and no basis to assume that the average return for years six and seven would equal the average of the declining returns. Tr. 5260-61, 5477-78 (Carron). However, First Federal stated that, in light of the interest rate decline, calculating damages in years two through five as an average was a conservative approach. As for years six

and seven, First Federal had established that Monroe's assets would by that time be incorporated with First Federal's. Therefore, the 87-basis-point return would be applied to the Association's foregone assets that were discussed in Section I.B.4, *supra*.

In addition to its damages of $27.156 million, Dr. Kaplan calculated that the breach caused First Federal to lose a franchise deposit premium of $28.981 million. Tr. 3165:1-14 (Kaplan). "Franchise deposit premium" is a component of franchise value. PX 8000 at 72. Dr. Kaplan explained that franchise value "is a term that is intended to capture . . . the value of the deposit-gathering network of branches in a typical financial institution . . . at a point in time." Tr. 3540:2-9 (Kaplan). When a buyer decides to purchase another financial institution's "branch deposit base . . . the parties, the buyer and the seller, negotiate and agree to a price." Tr. 3543:1-4 (Kaplan). Deposits represent a liability to the owner, so every $100 of deposits acquired represents $100 of liabilities to the buyer. Tr. 3543:1-2 (Kaplan). Dr. Kaplan presented a hypothetical in which "the buyer has agreed to accept $94 in cash as part of that transaction, so that what is going on is the buyer is accepting legal responsibility, assuming the obligations of the liabilities of $100 [and] the buyer is accepting $94 in cash." Tr. 3543:5-10 (Kaplan). The six percent difference between the liabilities assumed and the cash received by the buyer is the franchise deposit premium. Tr. 3543:11-13 (Kaplan). The franchise deposit premium represents "the value of the deposit franchise and the associated future earnings it will generate" at that moment in time. PX 8000 at 72.

Dr. Kaplan used the premium from HSBC's acquisition of First Federal to calculate the deposit franchise premium for the Monroe deposits. Dr. Kaplan reasoned that if the Monroe transaction had gone forward, the Monroe deposits would have been part of the deposits acquired by HSBC. In particular, First Federal planned that when Monroe was acquired, the restructuring of Monroe's operations was to take place within one year. This meant that the Monroe deposits would have been consolidated and mixed with First Federal's deposits in a short time. Tr. 3541:5-25 (Kaplan) ("So in effect, the eggs would be scrambled rather quickly. And from that point forward . . . deposits would be part and parcel of . . . First Federal's and really would be indistinguishable."). Accordingly, to calculate the deposit franchise premium, Dr. Kaplan identified the 6.14 percent premium that HSBC paid to acquire First Federal. Tr. 3542:1-3544:1 (Kaplan). Dr. Kaplan then applied that percentage to the $472 million in core deposits Monroe had as of October 1989 to arrive at the $28.981 million franchise deposit premium. Tr. 3544:2-20 (Kaplan).

Dr. Kaplan then added the $28.981 million franchise deposit premium to the $27.156 million in lost spread income, yielding a total of $56.137 million in damages caused by First Federal's failure to acquire Monroe, which, in turn, was caused by the Government's breach. *See* Section I.D, *supra*. As stated earlier, the Court found Dr. Kaplan to be a knowledgeable, thorough, and credible witness. *See* p. 21, *supra*. Dr. Kaplan's damages calculations provide a sound basis for making a fair and reasonable approximation of First Federal's damages caused by its having been precluded, by reason of the Government's breach, from acquiring Monroe. The Court therefore concludes that Dr. Kaplan's analysis, and First Federal's own analyses done in

1988 and 1989, establish with reasonable certainty the amount of First Federal's damages over the period 1990-1997 due to its inability to acquire Monroe ($56.137 million).

## III. The Government's Breach of the Financing Agreement Forced First Federal to Agree to be Acquired by Canada Trust, And First Federal Sustained Damages of $14.383 Million As a Result

First Federal argues that if FIRREA's capital requirements had not been imposed upon the Association, it would not have gone forward with the Canada Trust transaction. Tr. 346:25-347:25 (Borshoff). The transaction did not accord with First Federal's conversion plans. *Id.* But for the breach, First Federal argues, instead of agreeing to the Canada Trust acquisition, the Association would have undertaken a standard conversion in 1993, when market conditions were more favorable for such a conversion, and when the Association's net operating loss carryforwards ("NOLs") were sufficiently exhausted.[21] Tr. 2403:9-2405:20 (Chaplin). First Federal claims it suffered $23.883 million in damages as a result of the Canada Trust transaction. That figure includes: $3 million to repurchase the warrant rights from the FDIC;[22] $1.983 million in costs and fees incurred to complete the Canada Trust transaction, including attorneys' fees of $880,000, New York State transfer fees of $403,000, and a $700,000 payment to management resulting from the change in control; $11.5 million due to income lost by reason of the need to restructure First Federal's asset portfolio in order to comply with risk-based capital standards; and $7.4 million in lost tax benefits.

### A. Consistent With the Views of the Federal Home Loan Bank Board, Expressed In 1988, First Federal Intended to Raise $150 Million in a Standard Conversion After It Had Compiled Three Years of Audited GAAP Financial Statements

First Federal began to prepare to access the public markets after the Financing Agreement was executed. PX 17 at WOF0202054. The Association had an initial goal of raising $150 million in a standard conversion within 18 to 36 months of recapitalization. *Id.* First Federal began exploring specifically what would be required to raise capital through a standard conversion. The Association engaged Goldman Sachs & Co. ("Goldman") and Merrill Lynch to serve as its conversion initial public offering ("IPO") investment advisors. PX 3 at FR001581; PX 7 at FR000614. Following the broad stock market decline of October 19, 1987, Goldman advised First Federal in January 1988 that, in light of prevailing market conditions, it was unlikely that a standard conversion would be successful at that time. *Id.* at FR001583-84.

---

[21] The NOLs were tax credits that First Federal could utilize to offset income realized in future years. *LaSalle Talman,* 45 Fed. Cl. at 71.

[22] After FIRREA was passed, the FDIC assumed control of the thrift insurance fund from the FSLIC, which previously held the warrant rights.

In May 1988, representatives of First Federal met with officials in the chief accountant's office at the FHLBB. First Federal was told at that time that it needed to be able to present three years of audited financial statements prepared in accordance with GAAP in order to undertake a standard conversion. PX 4 at FR001561-62; Tr. 178:16-180:1 (Borshoff); Tr. 1136:22-1137:15 (Chaplin). First Federal also confirmed with the regulators that the Association would be able to present certified GAAP financial statements only for periods following August 8, 1986, the date of recapitalization. Tr. 1137:1-15 (Chaplin).

In a number of capital planning meetings held over the years following the execution of the Financing Agreement, senior management and the Board discussed the possibility of undertaking various alternatives to a standard conversion, including a modified conversion. *See* PX 113 at FR371725-27; Tr. 673:17-674:6 (Borshoff). Each of those discussions concluded that the conversion requirement[23] would probably be satisfied by a modified conversion but that a standard conversion was the preferred alternative. PX 113 at FR371726; Tr. 673:17-674:6 (Borshoff). Those discussions focused on the disadvantages a modified conversion posed to the Association, including a loss of depositors' rights to participate in the conversion, potential loss of institutional identity, and the risk of loss of management control. PX 118 at FR055828; Tr. 200:11-22 (Borshoff). In addition, a modified conversion was considered to be inappropriate because it was available only to undercapitalized institutions and First Federal did not qualify as such under the Financing Agreement. PX 118 at FR055828; Tr. 174:12-175:15; 696:24-698:8 (Borshoff).

The operating strategy implemented by First Federal in connection with the Financing Agreement emphasized "the generation of a sustained, improving track record of earnings and business activity" as an essential prerequisite for First Federal's subsequent conversion. PX 17, Exhibit E (Capital Plan), at WOF0202054. First Federal was successful in implementing that strategy. Between the execution of the Financing Agreement and December 31, 1989, First Federal increased its GAAP capital by $73 million to $129 million. PX 52 (1986 Audited Financials) at FR334027. The market for conversions, however, changed during that three-year period. In January 1989, Goldman advised First Federal that the prevailing market conditions for thrift equities were unfavorable. PX 5 at FR001667. Later, in December 1989, Merrill Lynch advised First Federal that it could expect to raise only $75 to $110 million in a standard

---

[23] Section 6.04, the Conversion Covenant, stated:

> First Federal shall use its best efforts in good faith to complete the Common Stock Offering and to consummate the Conversion as soon as practicable, provided that the Board of Directors shall have reasonably determined that it is in the best interests of First Federal to proceed with the Conversion. First Federal shall furnish to the Supervisory Agent a semi-annual report . . . . as to its progress toward making the Common Stock Offering.

PX 17 at WOF0202000.

conversion, and then only by waiting until June 1991. PX 7 at FR000614-15. By the end of 1989, when First Federal was approaching the point at which it would have the three years of audited GAAP financial statements necessary to convert, market conditions were so poor that First Federal did not have any hope of raising its goal of $150 million in capital. PX 7 at FR000614. The depressed market conditions continued until mid-1992, when they began to improve. Throughout the rest of 1992 and continuing into mid-1994, standard conversions were successfully completed at an increasing rate, and the amount of capital raised also steadily increased. Tr. 3062:14-3063:19, 3077:9-25 (Kaplan).

Canada Trust was interested in entering the financial services market in the northern United States. Tr. 255:6-13 (Borshoff). Canada Trust initially contacted Mr. Borshoff and expressed an interest in pursuing merger discussions in the fall of 1988. Tr. 254:5-255:4; 261:19-262:11 (Borshoff). Mr. Richard B. Coles, who was then an officer of Canada Trust, proposed having First Federal convert to a stock association and having Canada Trust acquire a majority of the resulting common stock. DX 1778 at 6-7. Canada Trust was particularly interested in First Federal because it believed that the Association was in need of capital and Canada Trust had substantial capital available to invest. *Id.* at 13-14. Mr. Borshoff responded that First Federal was not interested in being acquired. He stated that the Association wished to remain independent and that it was not under any immediate capital pressure because it was operating under the Financing Agreement. *Id.* at 12-13.

Canada Trust maintained its interest in First Federal and periodically contacted Mr. Borshoff in order to keep open the lines of communication. *Id.* at 11, 15. Mr. Borshoff reiterated that First Federal preferred to remain independent. *Id.* at 12, 15; Tr. 260:1-12 (Borshoff). Mr. Borshoff informed the other officers and the Board of Directors of First Federal of the Canada Trust contacts, and they agreed with his response. Tr. 260:15-261:2 (Borshoff).

B. <u>The Breach Forced First Federal to Enter Into a Modified Conversion with Canada Trust in 1991</u>

As noted earlier, FIRREA's capital requirements were more onerous than those set forth in Section 6.10 of the Financing Agreement. Specifically, FIRREA established a tangible capital level of 1.5 percent of assets and required a core capital ratio of 3 percent. FIRREA also set a new risk-based capital requirement. Tr. 2930:6-21 (Kaplan); *LaSalle Talman*, 45 Fed. Cl. at 74. At the end of 1989, First Federal had tangible capital of $4.8 million, falling short of the $82.7 million required by FIRREA by $77.9 million. Tr. 2938:2-12 (Kaplan). First Federal had $90 million of core capital at that time, falling short of the $165.4 million required by FIRREA by $75 million. Finally, First Federal had $102 million of risk-based capital at the end of 1989, falling short of the $197 million required by FIRREA by $95 million. Tr. 2940:1-2941:1 (Kaplan).

In 1990, First Federal's capital in excess of its Financing Agreement requirements had risen from $69 million to nearly $87 million. Tr. 2990:25-2991:15 (Kaplan); PX 737 (Kaplan

Report Ex. 5). However, First Federal still fell short of FIRREA's capital requirements. The Association had tangible capital of $34.914 million, falling short of FIRREA's requirement by approximately $48 million. First Federal had core capital of $119.975 million, falling short of FIRREA's requirement by another $48 million. Finally, First Federal had $135.744 million in risk-based capital, falling short of FIRREA's requirement by about $75 million. Tr. 2991:16-2992:24 (Kaplan); PX 737 (Kaplan Report Ex. 5). Though First Federal had reduced its capital deficits by the end of 1990, the Association was still "woefully out of capital compliance" with FIRREA's capital requirements. Tr. 2992:16-24 (Kaplan).

Following the enactment of FIRREA, First Federal was not permitted to rely upon the net worth ratios set forth in the Financing Agreement. *See First Federal I*, 58 Fed. Cl. at 143 (recounting that in December 1989, OTS informed First Federal that it did not satisfy the capital requirements of FIRREA, and that it would be required to submit a Capital Plan in accordance with TB-36). Thus, the Association's response to Canada Trust's overtures changed in early 1990. Tr. 266:19-268:6 (Borshoff); 4073:13-20 (Kaplan). At that point, Mr. Borshoff accepted an invitation to a meeting at which the general framework of a merger was discussed. The discussion included the amount of capital that Canada Trust would invest, the timing of the merger, and the nature of the ongoing relationship between First Federal and Canada Trust. Tr. 268:5-14 (Borshoff).

As noted in Part I of the "Background" section, *supra*, the OTS conditionally approved First Federal's Strategic Business Plan on May 22, 1990. Tr. 271:17-274:8 (Borshoff). In its conditional approval, the OTS stated that it would "consider taking supervisory or other action if the Association fails to comply with its [Strategic Business Plan] or the conditions of approval." PX 248 at FR000258. Among the conditions of approval was the requirement that First Federal at all times make diligent and good faith efforts to seek a capital infusion equal to fully phased-in capital. *Id.* at FR000259. OTS specified that the OTS District Director or his designee would have sole discretion to determine if First Federal failed to satisfy this condition. *Id.*

Though First Federal had not yet committed to a merger with Canada Trust, the parties had outlined the framework of a transaction, and Canada Trust completed its due diligence. Tr. 274:4-275:10 (Borshoff). First Federal's Board of Directors discussed the implications of the May 22, 1990, letter from OTS at a meeting on June 4, 1990. *See* PX 104F. Mr. Mullin testified that the Board was concerned about what would happen if the Association failed to satisfy the goals of the Strategic Business Plan. Tr. 3393:14-22 (Mullin). "So our only alternative, we thought, was to go with the [Canada Trust] transaction." Tr. 3393:21-22 (Mullin). Mr. Borshoff said he viewed the Canada Trust transaction as a "survival life raft . . . . We were embarking upon a path that we didn't want to go down, but it was better than drowning." Tr. 275:14-277:16 (Borshoff).

On September 27, 1990, First Federal adopted a Plan of Reorganization under which the Association would effect a modified conversion. PX 104J at FR089730-32. The Plan of Reorganization provided that CT Financial Services, Inc., a wholly owned subsidiary of Canada

Trust, would purchase 85 percent of the outstanding stock of First Federal for $150 million. *First Federal I*, 58 Fed. Cl. at 153. The remaining 15 percent would be offered to First Federal's depositors. *Id.* First Federal's Board of Directors approved the plan after determining that, under the circumstances, *i.e.*, having a "gun to its head," the transaction was in the best interests of the Association and its depositors. Tr. 768:8-769:7 (Borshoff).

After the Plan of Reorganization was adopted, First Federal concluded that a depositor offering was not likely to be successful and that it was not absolutely required. The offering was not likely to be successful because the share price paid by Canada Trust included a premium to obtain a controlling interest in First Federal and depositors were unlikely to pay the same price for a minority interest in the Association. PX 346 at FR153788-89. As a result, the agreement was renegotiated and First Federal agreed to sell 99 percent of its stock to Canada Trust. The agreement was approved by First Federal's Board of Directors on March 21, 1991. PX 346; *First Federal I*, 58 Fed. Cl. at 153.

Canada Trust acquired First Federal on May 8, 1991. In that transaction, First Federal converted from a mutual to a stock association and Canada Trust, through CTUS, a United States unitary thrift holding company formed on the same date, purchased 18.8 million shares of newly issued First Federal common stock for $188 million, representing a 99 percent controlling interest in First Federal. As part of the Canada Trust acquisition, First Federal also granted and issued 199,487 shares of common stock to its senior management for approximately $2 million, representing a one percent interest. Tr. 2993:20-2994:5 (Kaplan). Thus, First Federal received $190 million in gross proceeds from the modified conversion.

The net proceeds of the modified conversion, however, were only $58 million. Tr. 2995:21-2996:6 (Kaplan). That is because First Federal was required under GAAP to make mark-to-market accounting adjustments as part of the Canada Trust acquisition. The effect of such adjustments was to eliminate $132.371 million of the Association's pre-existing GAAP net worth. Tr. 2994:13-2995:21 (Kaplan).

The Government argues that, far from being forced to accept Canada Trust's proposal, First Federal agreed to be acquired by Canada Trust because it found the transaction to be advantageous. Mr. Borshoff, the Government notes, had characterized the Canada Trust merger as a "golden opportunity" for the two banks. Tr. 269:16-22 (Borshoff). The merger provided a source of capital that First Federal could use to acquire thrifts that were being seized for failure to comply with FIRREA. Tr. 269-70 (Borshoff); PX 347 at 3; DX 1790 at PFR1950652. The merger also offered Canada Trust the opportunity to build its franchise in the northeastern United States. Tr. 269:23-25 (Borshoff). Mr. Borshoff testified, however, that he used the term "golden opportunity" as part of a sales pitch to Canada Trust. Tr. 269:13-270:2 (Borshoff). After management was informed by OTS in December 1989 that First Federal did not satisfy FIRREA's new capital requirements, "we believed we were in serious trouble. . . . I felt a desperate need to pick up the telephone and call Canada Trust and tell them that we would like to talk." Tr. 267:8-13 (Borshoff). Because First Federal was in a desperate situation, Mr. Borshoff

met with Canada Trust's management and gave them a sales pitch. He argued that a merger would present First Federal and Canada Trust with an opportunity to acquire other banks that were being seized and sold by the Government. Tr. 269:13-270:2 (Borshoff).

The Government also points out that First Federal always intended to comply with the prevailing capital regulations as a prerequisite to undertaking a standard conversion and, even in a non-breach world, therefore, First Federal would have been required, as a practical matter, to comply with FIRREA's capital requirements in order to undertake a standard conversion. DX 513 at PFR1102156; PX 87 at FR142737; PX 4 at FR001563; DPCL at 44. However, it was only the risk of seizure, due to the Government's breach of Section 6.10, that caused First Federal to agree to be acquired by Canada Trust. At the time FIRREA was enacted in August 1989, First Federal's capital was more than double that required under Section 6.10 (the Association had a net worth ratio of 2.34 percent; under Section 6.10 a ratio of 1.09 percent was required). Tr. 1892:24-1893:7 (Chaplin); PX 17 at WOF0202005. After August 1989, the capital standards of Section 6.10 would have continued to apply for seven more years.[24] PX 17 at WOL0202005. Thus, absent the breach, First Federal would not have been under any immediate pressure to convert. Instead, it would have been free to wait until the markets allowed for a successful standard conversion. Tr. 777:17-778:1 (Borshoff).

C. But For the Breach, First Federal Would Have Undertaken a Standard Conversion in 1993 That Would Have Raised Net Proceeds of Approximately $177.5 Million

Dr. Kaplan explained why, in a non-breach world, First Federal would have waited until 1993 to undertake a standard conversion. To begin with, First Federal had a goal of raising $150 million in a standard conversion. Tr. 3061:12-3062:2 (Kaplan); PX 17 at WOF0202054. However, the thrift equity market declined from January 1990 until November 1990, making it unlikely that First Federal would raise $150 million in a standard conversion at that time. Tr. 3073:2-3075:21 (Kaplan); PX 221; PX 8000 at 56. It was not until the fall of 1992 that the market strengthened and investor enthusiasm was building. Tr. 3077:9-11 (Kaplan). During 1992, the "pop," or first-week price gain of thrift IPOs, was increasing. Tr. 3080:16-3082:25 (Kaplan). Also, eight other New York thrifts converted in 1993, proof that, like First Federal, other New York thrifts were deciding to take advantage of the growing thrift conversion market. Tr. 3083:15-3087:4 (Kaplan). These developments would have increased the likelihood that First Federal would have been able to raise $150 million in a standard conversion.

---

[24] Section 6.10 provided that First Federal could operate independent of regulatory net worth requirements for a period of up to ten years following the execution of the Agreement in August 1986. *See* PX 17 at WOF0202005 (setting forth the net worth requirements in Section 6.10 effective in years one through ten following the August 1986 closing). *See also* Section 8.03 (providing that the Financing Agreement would terminate on the tenth anniversary of its execution, or five years after First Federal converted from a mutual to a stock institution, whichever occurred later) *Id.* at WOF0202007.

Second, it would not have been until the end of 1992 that First Federal's NOLs would largely have been exhausted. Tr. 3062:3-3063:12 (Kaplan). Third, the net worth ratio requirement of the Financing Agreement was scheduled to increase from 1.41 to 3.56 percent in August 1993. Tr. 3065:13-3066:8 (Kaplan); PX 17 at WOF0202005. First Federal would have considered this deadline in deciding when to enter into a standard conversion.[25] Finally, Dr. Kaplan observed that approximately 9 to 12 months were required to consummate the transaction after the board of directors decided to convert. Tr. 3064:13-3065:12 (Kaplan). Based on all these factors, Dr. Kaplan concluded that First Federal would have decided to convert in the fall of 1992, with a standard conversion to take place during the second quarter of 1993. Tr. 3077:9-25; 4081:5-18 (Kaplan).

To calculate the amount First Federal would have raised in a standard conversion in 1993, Dr. Kaplan analyzed certain so-called pricing ratios for the New York thrifts converting in 1993. Dr. Kaplan focused on price-to-book value as the most important of the pricing ratios. Tr. 3093:2-5 (Kaplan). For New York institutions, the 1993 median price-to-book value ratio was 60.5 percent; the average price-to-book value ratio was 59.4 percent. Tr. 3091:11-15 (Kaplan). Thus, Dr. Kaplan concluded that a price-to-*pro forma* book value ratio of 60 percent was appropriate in calculating the proceeds First Federal would have received. Tr. 3094:11-19, 3095:10-15 (Kaplan).

In order to determine the book value of a non-breached First Federal as of the relevant time period, Dr. Kaplan backed out the impact of the Canada Trust capital infusion. Tr. 3103:9-13 (Kaplan). Dr. Kaplan began with $233.222 million, the actual net worth of First Federal as of December 31, 1992, the date of the Association's financial information that would go into a conversion application and appraisal. Tr. 3106:10-16 (Kaplan); PX 8000 at 60 (*Pro Forma* Data for Conversion Analysis). Dr. Kaplan then added back the GAAP net worth lost due to the mark to market at the time of the Canada Trust transaction, which was $132.371 million. He then subtracted the amortization of goodwill that would have occurred, $24.5 million, and added back $23.6 million, the taxes that were paid for 1991 and 1992. Having made these adjustments, Dr. Kaplan arrived at a subtotal of $364.693 million. Finally, Dr. Kaplan took the initial capital infusion by Canada Trust, $188 million, and combined that with two years' worth of dividends that First Federal was forced to pay Canada Trust, less the amount of profit First Federal would have earned on its foregone assets, arriving at $169.136 million. Tr. 3106:17-25, 3109:24-3111:22 (Kaplan); PX 8000 at 60, 77. Subtracting the $169 million from the earlier subtotal, Dr. Kaplan calculated a book value for the non-breached bank at $195.557 million as of the end of 1992. Tr. 3111:24-3112:7 (Kaplan); PX 8000 at 60.[26]

---

[25] Although First Federal would have taken into account the scheduled step-up in the net worth ratio requirement, First Federal could have satisfied that requirement (a net worth ratio of 3.56 percent) even without a conversion. Tr. 3065:13-3066:8 (Kaplan).

[26] In order to calculate the book value of the non-breached First Federal as of the end of 1992, Dr. Kaplan had to determine the amount of after-tax retained earnings that First Federal

After determining First Federal's *pro forma* net worth of nearly $196 million and calculating the 60 percent price-to-*pro forma* capital ratio, Dr. Kaplan employed a formula prescribed by conversion pricing rules, regulations and guidelines in order to conclude that, had the Government not breached the Financing Agreement, a conversion in the second quarter of 1993 would have yielded $220 million in gross conversion proceeds. Tr. 3114:10-3115:21 (Kaplan); PX 8000 at 59. Subtracting fixed expenses of $6.460 million,[27] a management recognition program cost of $8.8 million, and an Employee Stock Ownership Program ("ESOP") cost of $15.4 million, Dr. Kaplan reduced the net proceeds from a standard conversion to $189.340 million. Tr. 3119:21-3122:3 (Kaplan); PX 752. Thereafter, Dr. Kaplan accounted for the value that the warrant rights would have had in 1993, $14.8 million, and subtracted that amount from the reduced net proceeds, and then added the $3 million paid for the warrant rights in 1991. The result is that a standard conversion in 1993 would have yielded net proceeds of $177.512 million. Tr. 3122:3-3123:13 (Kaplan); PX 752. Thus, First Federal established that, but for the breach, it would have undertaken a standard conversion in 1993 and received net proceeds of $177.5 million.[28]

---

would have had in its capital account. In determining that amount, Dr. Kaplan included $500,000 in lost profits that he claimed the Association suffered every month for 23 months (for a total of $11.5 million) as a result of restructuring its portfolio in preparing for the Canada Trust transaction. *See* Section III.D.4, *infra*; *see also* Tr. 3549:5-3561:18 (Kaplan); PX 8000 at 73 (Columns G, H), 77 (Columns G, H), 78; PX 753 (Columns G, H); PX 754 (Columns G, H). The Court has found, however, that First Federal established that it lost profits of $487,500 per month for only two months and $48,750 per month for 23 months (for a total of $2 million) as a result of the restructuring transactions. *See* Section V.D.4, *infra*. As a result, First Federal would have had less retained earnings in its capital account at the time the non-breached First Federal would have undergone its standard conversion. The amount of the proceeds that Dr. Kaplan calculated First Federal would have derived from its standard conversion is to that degree overstated. *See* Tr. 3055:14-3056:19 (Kaplan). As will be discussed in Section V, *infra*, for the purpose of calculating the correct amount of damages due, First Federal will be required to recalculate the amount of proceeds First Federal would have derived from its standard conversion in 1993 and the related offset, in light of the Court's finding that First Federal sustained lost profits in the amount of $487,500 for only two months as a result of restructuring its portfolio, instead of $500,000 per month for 23 months.

[27] The $6.460 million represented offering expenses including fixed expenses of $2.5 million for accounting, auditing, legal, and printing expenses; and $4.840 million in commissions to be paid for marketing the stock. Dr. Kaplan subtracted from that subtotal the $880,000 that the Association paid in accounting and legal fees in order to undertake the modified conversion in 1991. *See* Tr. 3119:20-3121:2 (Kaplan); PX 8000 at 59 (First Federal Conversion Proceeds, Earnings and Market Price Ratios).

[28] First Federal has not claimed any damages for the difference between the net benefit it would have received from a standard conversion in 1993, and the net benefit it received from the

D. The Canada Trust Transaction Caused First Federal to Incur $14.383 Million In Damages

1. First Federal Was Forced to Pay the FDIC $3 Million to Release Its Warrant Rights In Order to Complete the Canada Trust Transaction

a. Causation

In return for its approval of the Strategic Business Plan, the Government required First Federal to honor the warrant rights it had given the FSLIC at the time of the 1986 Financing Agreement. PX 248 at FR000257; Tr. 3216:15-19 (Mullin). Canada Trust refused to acquire First Federal as long as the Government retained the warrant rights granted under the Financing Agreement. Tr. 283:1-8 (Borshoff); Tr. 3220:18-3221:1 (Mullin). Therefore, prior to the Canada Trust transaction, First Federal sought to reacquire the warrant rights it had earlier granted to FSLIC. After some discussions among the regulators, the FDIC[29] required First Federal to pay $3 million to buy back the warrant rights. Tr. 3221:6-12 (Mullin). Mr. Mullin testified that, had Canada Trust not insisted that the warrant rights be extinguished as a condition of Canada Trust's acquiring First Federal, First Federal would never have offered to purchase the warrant rights from FDIC. Tr. 3355:17-3356:1 (Mullin). First Federal also argues that because the Government breached the Financing Agreement when it abrogated Section 6.10, the FDIC had no right to require First Federal to perform its obligations under the Warrant Agreement (Exhibit A to the Financing Agreement) and hence FDIC had no rights under the Warrant Agreement that it could demand be bought out.

The Government argues that First Federal's obligations were unaffected by its breach because the warrant rights represented consideration for FSLIC's financial assistance and debt

modified conversion with Canada Trust in 1991. *See* Pl.'s Reply to Def.'s Prop. Concl. of Law 22. Dr. Kaplan used the projected standard conversion in his damages analysis: (1) to demonstrate that, absent the breach, First Federal would have effected a standard conversion prior to the expiration of Section 6.10 and met the FIRREA capital requirements, as well as the capital standards of the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. No. 102-242, 105 Stat. 2236 (1991) ("FDICIA"), which was enacted in 1991 and became effective in December of 1992, Tr. 3072, 3580 (Kaplan); and (2) to determine the magnitude of the offset to be utilized in calculating First Federal's damages to account for the benefit of receiving funds from the Canada Trust conversion two years earlier than if First Federal had undertaken a standard conversion in 1993. *Id.* at 3561-62 (Kaplan).

[29] As noted in Part I of the "Background" section, *supra*, FIRREA transferred thrift insurance activities from the FSLIC to the FDIC. S*ee also Fifth Third Bank of W. Ohio*, 402 F.3d at 1221. Thus, after FIRREA, the FDIC held the warrant rights that First Federal had granted to the FSLIC when the Financing Agreement was executed.

forgiveness at the time of the Financing Agreement. The plan of conversion involved, among other things,

> an additional cash payment by FSLIC to First Federal at the Initial Closing in the amount of $200,000,000 [and] the cancellation of the Income Capital Certificates and the Net Worth Certificates . . . in exchange for First Federal's agreement to issue to FSLIC at the Conversion Closing . . . warrants to purchase a number of common shares equal to 25% of First Federal's issued and outstanding common stock . . . .

PX 17 at WOF0201952-53. As a result, the Government contends, its breach of Section 6.10 did not negate First Federal's responsibilities under the Warrant Agreement.

However, "[w]ithout clear support in the contract document and in the intent of the parties, a contract that is written as a unitary package shall not be severed into parts in order to favor the breaching party." *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548, 1553 (Fed. Cir. 1992). Applying the *Stone Forest* test for severability, the Financing Agreement was structured as a unitary package of interdependent provisions, collectively designed to enable First Federal to become profitable, convert from mutual to stock form, and relieve the Government of the cost of further assistance. PX 13 at WOT724048. Nowhere did the Financing Agreement indicate that the warrant provisions were severable from the capital provisions. Indeed, Section 8.05 of the Financing Agreement provided that the Agreement would be severable only if a provision of the Financing Agreement were "held to be prohibited or invalid under any applicable law," and only "to the extent of such prohibition or invalidity, without invalidating the remaining provisions of [the] Agreement." PX 17 at WOF0202008.

First Federal relies on the proposition that a prior material breach will excuse the non-breaching party from further performance. *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1380 (Fed. Cir. 2004). Under the doctrine of prior material breach, "each party is entitled to the assurance that he will not be called upon to perform his remaining duties . . . if there has already been an uncured material failure of performance by the other party." *Barron Bancshares*, 366 F.3d at 1380-81 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 237 cmt. b).

"A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract." *Thomas v. Dept. of Hous. & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997) (citing 5 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1104 (1964)). The capital provisions of Section 6.10 were of vital importance and went to the essence of the Financing Agreement. The Government's breach of Section 6.10 was a prior material breach of the Financing Agreement.

Of course, a prior material breach may be waived. The breach "merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it." *Cities Serv. Helex, Inc. v. United States*, 211 Ct. Cl. 222, 234, 543 F.2d 1306, 1313 (Ct. Cl. 1976)). "If he elects . . . to continue the contract, the obligations of both parties

remain in force and the injured party may retain only a claim for damages for partial breach." *Id.* at 234-35, 1313 (citing 5 SAMUEL WILLISTON & WALTER H.E. JAEGER, A TREATISE ON THE LAW OF CONTRACTS §§ 683-88 (3d ed. 1961); RESTATEMENT OF CONTRACTS §§ 317, 309-10 (1932)). The evidence made clear that First Federal did not waive the Government's breach of Section 6.10. As a matter of law, therefore, the Government's prior material breach of the "unitary package," *see Stone Forest*, 973 F.2d at 1552, that comprised the Financing Agreement excused First Federal from its obligation to issue warrants to FDIC. The evidence further established that the Government's breach caused First Federal to be required to purchase the warrant rights from the FDIC for $3 million. Tr. 3216:1-19; 3220:18-3221:14 (Mullin). First Federal has established that, but for the breach, it would not have done so. Therefore, First Federal's expenditure of $3 million was caused by the Government's breach and is properly recoverable as damages therefor.

b. Foreseeability

It was reasonably foreseeable that the Government's breach would cause First Federal to incur additional costs in purchasing the warrant rights from the FDIC. The parties contemplated that First Federal would pursue a standard conversion. However, without Section 6.10, First Federal would be deemed undercapitalized and would be forced to pursue additional capital through other means, including a modified conversion, in order to avoid seizure. In turn, it was reasonably foreseeable that the warrant rights would be an impediment to a modified conversion, since an acquirer would be less likely to purchase First Federal as long as the Government held warrant rights for up to 25 percent of First Federal's stock.[30] In that event, it was foreseeable that First Federal would either have to purchase the warrant rights from the FDIC or entice a buyer to accept the FDIC's potential minority interest in return for a reduction in the purchase price.

c. Reasonable Certainty

There is no dispute that the cost incurred by First Federal to purchase the warrant rights from FDIC in 1991 was $3 million.

2. First Federal Was Forced to Incur $1.98 Million in Fees and Costs In Order to Complete the Canada Trust Transaction

a. Causation

First Federal had to pay $1.983 million in costs and fees to complete the Canada Trust transaction. First Federal incurred $880,000 in attorneys' fees, Tr. 3569:24-3570:2 (Kaplan);

---

[30] In fact, in August 1986, when proposing new conversion regulations, the Government stated that the possibility of minority stockholders in a modified conversion had a chilling effect on potential acquirers. Conversions from Mutual to Stock Form and Acquisition of Control of Insured Institutions, 51 Fed. Reg. 30,956 (Aug. 29, 1986).

$403,000 in New York State transfer fees, Tr. 3570:3-5 (Kaplan); and also had to pay $700,000 in incentive compensation to management because of the change in control of the thrift. Tr. 3570:7-9 (Kaplan). First Federal contends that the costs and fees would not have been expended but for the breach. The Government, however, argues that a standard conversion in 1993 would have cost First Federal even more.

In support of the Government's argument, Dr. Carron estimated the amount of legal, accounting, and advisory fees to complete a standard conversion in 1993 to be $7.34 million. Tr. 5384-86 (Carron); DX 2046 at 60. The Government's argument notwithstanding, the transaction costs incurred by First Federal in the Canada Trust acquisition represented the reasonable costs of mitigating the harm caused by the breach, and such costs are recoverable as damages. An injured party is

> entitled to recover for all loss actually suffered. Items of loss other than loss in value of the other party's performance are often characterized as incidental or consequential. Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction.

RESTATEMENT (SECOND) OF CONTRACTS § 347, cmt. c. To the extent that the non-breached First Federal would have incurred greater costs in connection with a standard conversion in 1993, that difference should be (and was) accounted for in calculating an offset to First Federal's damages to take account of the benefits that flowed to First Federal as a result of the Canada Trust transaction. *See* Section VI, *infra*. Because the Government's breach forced First Federal to enter into a modified conversion with Canada Trust, the transaction costs associated with that conversion were also caused by the Government's breach, and are recoverable by plaintiff.

b. Foreseeability

"[W]here a thrift must raise capital in response to the breach, the costs of mitigation are foreseeable." *Citizens Fed. Bank v. United States*, 66 Fed. Cl. 179, 197 (2005) (citing *Bluebonnet*, 266 F.3d at 1355). The costs and fees incurred by First Federal in connection with the Canada Trust acquisition were the normal and necessary costs of completing a modified conversion. It was reasonably foreseeable that a breach of Section 6.10 would force First Federal to undertake such a conversion and incur such fees and costs.

c. Reasonable Certainty

There is no dispute that First Federal was required to pay $1.98 million in fees and costs in order to undertake the Canada Trust transaction in 1991.

3. First Federal Was Forced to Forego the Benefit of Net Operating Losses Worth $7.4 Million In Order to Complete the Canada Trust Transaction

a. Causation

First Federal claims that the Canada Trust transaction cost First Federal the benefit of NOLs for 1991 and 1992. NOLs are tax credits that First Federal could utilize to offset income in future years. *LaSalle Talman,* 45 Fed. Cl. at 72. Mr. Chaplin explained that the NOLs were valuable to the Association because they "allowed us to eliminate . . . most . . . federal income tax from our operations. That would allow the funds to go directly to our capital base." Tr. 1127:10-21 (Chaplin). There was, however, a "tipping point" at which the value of NOLs was outweighed by capital coming into the Association. *See* Tr. 741:5-742:5 (Borshoff).

The Government contends that the tipping point was any time after June 1991. First Federal stated in the Strategic Business Plan that financial projections demonstrated that the Association would convert after NOLs had been "substantially utilized, that is, any time after June 1991." PX 333 at FR002065. This, however, was a statement made under the pressures being exerted by FIRREA. Tr. 2382:15-23 (Chaplin). But for the breach, First Federal would have deferred conversion and maximized the benefit of its NOLs until they expired at the end of 1992. Tr. 2382:11-2384:9; 2405:1-4 (Chaplin).

Instead, Canada Trust's acquisition of First Federal caused $21.7 million of First Federal's NOLs to expire in 1991, one year earlier than they otherwise would have expired. *See* PX 749 (Wolf. Dep. Tr.) at 44-46; DX 1642 ¶ 7.[31] Applying to the $21.7 million worth of NOLs lost as a result of the Canada Trust transaction the 34 percent tax rate to which the Association was subject in 1991 and 1992, First Federal lost $7.391 million in tax benefits. Tr. 3608:20-3610:7 (Kaplan); DX 1642 ¶ 8; PX 749 (Wolf Dep. Tr.). Dr. Kaplan confirmed the calculation and included the nearly $7.4 million in lost NOL benefits in First Federal's claim for damages attributable to the CT transaction. Tr. 3609:10-3610:7; 3611:6-17 (Kaplan). First Federal has shown that but for the breach, First Federal would have used $21.7 million in NOLs until they

[31] Mr. Wolf had served as an expert in taxation for the Government earlier in this case. In January 2002, Mr. Wolf submitted an expert report regarding the income tax aspects of Dr. Kaplan's damage calculation. DX 1642. Dr. Kaplan, regarding Mr. Wolf's analysis as the type he would customarily rely upon in forming opinions or inferences in his field of expertise, relied upon Mr. Wolf's analysis in calculating lost NOLs, explaining that

> there are often issues that come up in the course of my work that require a level of expertise in the tax area that exceeds my own, so that is sort of a routine and normal practice that I've done on any number of occasions over a span of years I've been doing this work.

Tr. 3606:10-14 (Kaplan).

expired at the end of 1992, from which the Association would have derived a benefit of nearly $7.4 million.

b. Foreseeability

First Federal's audited financial statements for the period ending December 31, 1985 contained a note describing NOLs totaling almost $400 million then belonging to the Association. Tr. 1090:1-12 (Chaplin); DX 173 at FR554116. The note was included in the financial statements to reflect the opportunity to use those NOLs to reduce taxes if the Association became profitable. Tr. 1090:20-1091:5 (Chaplin). The Government was on notice of the Association's NOLs when it entered into the 1986 Financing Agreement. The Internal Revenue Code limited the annual amount of an entity's NOLs that it could use following change in the entity's ownership of more than 50 percent. *See* DX 1642 ¶ 7. Thus, it was reasonably foreseeable that a breach would lead to a modified conversion that would involve a change of control and hence would limit the benefit to First Federal of its NOLs.

c. Reasonable Certainty

The value of the tax benefits lost was established with reasonable certainty. Dr. Kaplan reviewed and confirmed Mr. Wolf's conclusions as to the amount of NOLs lost, and the corresponding tax benefits lost, as a result of the Canada Trust transaction. There was no doubt about the ability of Mr. Wolf to make such calculations. Though Dr. Kaplan did not have the same level of expertise as Mr. Wolf with respect to calculation of NOLs, Dr. Kaplan's qualifications and familiarity with the subject matter were sufficient to permit him to testify as he did, relying in part on the work of Mr. Wolf. PX 749 (Wolf Dep. Tr.) at 91-92; DX 1642 ¶¶ 7-8.

4. First Federal Lost Profits of $2 Million In Restructuring Its Portfolio In Order to Achieve Compliance With FIRREA's Risk-Based Capital Requirements Incident to the Canada Trust Transaction

a. Causation

To obtain regulatory approval of its modified conversion, First Federal was required to show, among other things, that it would satisfy the fully phased-in, risk-based capital requirements of FIRREA following the Canada Trust transaction. However, even with a capital infusion by Canada Trust of $188 million, First Federal calculated that it would fall $36 million short of the FIRREA risked-based capital requirements following its modified conversion. Tr. 2999:7-3001:23; 3036:9-25 (Kaplan); PX 8000 at 46, 51. As a result, in order to comply with FIRREA's risk-based capital requirements First Federal reasonably undertook to restructure its portfolio by replacing certain higher risk-weighted assets with lower risk-weighted assets. Tr. 3010:8-3011:2 (Kaplan). Dr. Kaplan explained that though the total amount of assets remained the same, First Federal incurred a loss of earnings as a result of the restructuring, because the lower risk-weighted assets provided a lower rate of return. Tr. 3015:21-3016:9 (Kaplan).

In a memorandum to the Officers Management Committee of the Board of Directors dated April 12, 1991, Mr. Chaplin described the restructuring transactions that First Federal would undertake in advance of the Canada Trust acquisition. First Federal would: (1) convert the commercial paper of First Federal's finance subsidiaries to zero percent assets[32] in the amount of $121 million, resulting in reduced net interest margin of $20,000 per month; (2) swap whole loan mortgages for Freddie Mac participation certificates ("PCs") in the amount of $150 million, costing $28,750 per month; (3) convert existing liquid assets to Treasury securities in the amount of $140 million, for which First Federal would incur no monthly cost; and (4) sell mortgage-backed securities in the amount of $69 million, costing $172,500 per month, with the additional possible sale of more mortgage-backed securities in the amount of $140 million, costing $315,000 per month. PX 381 at FFR0052485; *see* Tr. 3016:10-3020:13 (Kaplan), 1380:5-1381:12 (Chaplin);. The aggregate net impact on earnings was $536,250 per month.[33] Tr. 3020:20-3021:8 (Kaplan); PX 8000 at 47.

Dr. Kaplan next estimated the number of months over which First Federal sustained $536,250 per month in lost earnings. He testified that First Federal's risk-weighted assets had declined considerably by the time of the Canada Trust transaction. Tr. 3041:5-3043:21 (Kaplan); PX 8002 (Total Risk-Weighted Assets, March 1990 to December 1994). Dr. Kaplan also testified that the Association's total assets did not return to their pre-Canada Trust levels until 23 months later, in April 1993. Tr. 3564:19-3565:24; 4067:5-13, 5899:2-23 (Kaplan); PX 8002. Dr. Kaplan rounded down the amount of monthly lost income to $500,000 and then multiplied that amount by 23 months (June 1991 until April 1993). Based on that calculation, Dr. Kaplan estimated that First Federal lost a total of $11.5 million in income as a result of restructuring its portfolio. Tr. 3565:1-5 (Kaplan).

The Government disputes that First Federal is due any damages on account of restructuring its asset portfolio. Even if there had been no breach of Section 6.10, the Government argues, First Federal would still have had to restructure its portfolio prior to a standard conversion. Dr. Carron and Dr. Rochester testified that it was common industry practice for banks to restructure their portfolios prior to a standard conversion. Tr. 5361-62 (Carron), 4759 (Rochester). The Government also noted that First Federal restructured and shrank its portfolio in 1996 when it was preparing for its acquisition by HSBC. Tr. 5218 (Carron); 3027-28 (Kaplan); PX 8000 at 3.

---

[32] "Zero percent assets" were United States Treasury securities, representing the lowest risk-weighted assets available, and providing the lowest rate of return of the assets in First Federal's portfolio. *See* Tr. 3011:21-3012:2 (Kaplan).

[33] The aggregate net impact of $536,250 per month was derived by adding $20,000 lost on the commercial paper conversion, $28,750 lost on the whole loan mortgage swap, $172,500 lost on the sale of mortgage-backed securities in the amount of $69 million, and $315,000 lost on the sale of mortgage-backed securities in the amount of $140 million.

However, the fact that First Federal restructured its portfolio prior to the Canada Trust and HSBC acquisitions is irrelevant to whether First Federal would have engaged in similar restructuring prior to a standard conversion. The Canada Trust and HSBC transactions were acquisitions. In contrast, Dr. Kaplan testified that shrinkage would *not* normally occur in connection with a public offering.

> To the extent that an institution is going to attempt to do anything to improve the proceeds, it would try and put on a little more growth immediately before a standard conversion. For the most part, it's just normal operations. But shrinkage would not be something an institution does immediately before doing a standard conversion and an IPO offering.

Tr. 5895:3-14 (Kaplan). Dr. Kaplan also testified that in the non-breach world, First Federal would not have had to restructure its portfolio before a standard conversion in 1993 because, operating under the Financing Agreement, its capital requirements would have been as set forth in Section 6.10 and therefore First Federal would not have been concerned about any risk-based capital requirements. Tr. 5895:19-24 (Kaplan) ("First Federal, as a non-breached institution approaching a standard conversion, is operating under its contract, and it doesn't have a risk-based capital requirement to be concerned about.")

The Government also argues that First Federal could have undertaken other transactions to comply with FIRREA's risk-based capital requirement without sacrificing earnings. First Federal could have reinvested the proceeds from the mortgage-backed security sales into Ginnie Mae securities rather than Treasury securities. Tr. 5371-72 (Carron); DX 2046 at 54. First Federal did, however, purchase Ginnie Mae securities. DX 1183 at FR309718. First Federal did not purchase a larger quantity of Ginnie Maes because they posed an interest rate risk that was different from Freddie Mac or Fannie Mae securities.[34] Tr. 5719:10-5720:15 (Chaplin). First Federal established that it acted reasonably in restructuring its asset portfolio as it did and that the restructuring was required in order for the Association to comply with FIRREA's risk-based capital requirement. First Federal also established that it would not have undertaken the restructuring but for the breach.

However, First Federal failed to rebut Dr. Carron's testimony that it reversed the two most significant restructuring transactions described by Mr. Chaplin within two months. Dr. Carron explained that, according to Mr. Chaplin's April 12, 1991 memorandum, the restructuring transactions were projected to add $470 million of Treasury securities to First Federal's portfolio.[35] Tr. 5369:10-21 (Carron); DX 2046 at 54; PX 381 at FFR0052485; PX 8000 at 47.

---

[34] Mr. Chaplin explained that unlike Fannie Maes or Freddie Macs, Ginnie Mae securities are assumable and bear unique prepayment characteristics. Tr. 5719:10-5720:15 (Chaplin).

[35] The $470 million in Treasury securities would have arisen from the $121 million conversion of commercial paper of First Federal's finance subsidiaries to zero percent assets; the

However, Dr. Carron observed, only $123 million worth of Treasury securities were in First Federal's portfolio at the end of June 1991. That amount, $123 million, approximated the result of converting the commercial paper of First Federal's finance subsidiaries, as Mr. Chaplin had proposed, to Treasury securities in the amount of $121 million. Tr. 5369:22-25 (Carron); *see also* DX 2046 at 54. Dr. Carron explained that if First Federal had *not* reversed the transactions there would have been "an increase on the books [of First Federal] of $470 million in U.S. Treasuries" as of the end of June 1991. Tr. 5369:10-21 (Carron). Thus, Dr. Carron concluded, First Federal had by the end of June 1991 reversed the two restructuring transactions that had by far the largest adverse effect on First Federal's earnings. Tr. 5369:22-5370:11 (Carron). Together those two transactions accounted for a loss of earnings of $487,500 per month ($536,250 minus $48,750). *See* p. 53 & note 33, *supra*. Dr. Carron did not, however, refute Dr. Kaplan's testimony that First Federal suffered lost earnings of $48,750 per month for 23 months on its commercial paper conversion and whole loan mortgage swap.

First Federal argues that Mr. Chaplin indicated in his April memorandum that some of the restructuring transactions, including "[t]he write down of specific assets, the sale of mortgage backed securities and the swapping of whole loans for securities represent permanent reductions in the Association's ongoing Risk Based Capital Requirement." PX 381 at FFR0052488. However, Mr. Chaplin stated at a meeting of the Board of Directors on May 23, 1991 that some of those transactions could indeed be reversed. He reported that "as the Association's [sic] generates earnings on a monthly basis, its investments in lower yielding treasury securities can be redeployed to more traditional mortgage-backed securities[,] which generate a higher yield." PX 105G (Minutes of the May 23, 1991 Meeting of the Board of Directors) at FR016943. Mr. Chaplin added that "due to these investments in lower yielding treasuries, the Association will experience some compression in interest margin in May and June." *Id.*

Dr. Kaplan was unable to explain why, if First Federal had entered into the restructuring transactions as Mr. Chaplin had indicated in his April 1991 memorandum, there were only $123 million of Treasury securities in First Federal's asset portfolio in June 1991. That was because Dr. Kaplan relied entirely on the projections set forth in Mr. Chaplin's April 1991 memorandum. *See* Tr. 4027:4-15 (Kaplan). Mr. Chaplin affirmed that his April 1991 memorandum was not a record of restructuring transactions that had actually taken place. Tr. 2034:13-18 (Chaplin). Dr. Kaplan acknowledged that he did not follow the course of events on each restructuring transaction in the months and years following the Canada Trust transaction. Tr. 4024-25 (Kaplan); *see also* DX 1178 (June 1991 Thrift Financial Report submitted to OTS by First Federal). He conceded that First Federal "may not have implemented [the restructuring transactions] exactly . . . with regard to the timing that's indicated in Mr. Chaplin's memo. I really can't speak to that." Tr. 4028:16-18 (Kaplan).

---

$150 million swap of whole loan mortgages for Freddie Mac PCs; and the $209 million sale of mortgage-backed securities (comprised of the sale of $69 million of mortgage-backed securities as well as the additional sale of $140 million of mortgage-backed securities) to reinvest in Treasury securities. *See* Tr. 5369:16-21 (Carron); PX 381 at FFR0052485.

The Court finds that First Federal entered into the restructuring transactions described by Mr. Chaplin in order to prepare for the Canada Trust acquisition, but that the two most significant of those transactions were reversed by the end of June 1991. *See* Tr. 5370:13-14 (Carron) ("My conclusion is that they probably did these transactions in late April, early May, but then particularly with respect to the last two that had the most substantial earnings impact, they reversed most of those in May and most of the balance in June."). That is, First Federal established that it suffered a loss of earnings of $487,500 per month for two months and $48,750 per month for 23 months for a total of approximately $2 million as a result of the restructuring of its asset portfolio required by the Government's breach of the Financing Agreement, rather than, as First Federal claimed, $500,000 per month for 23 months for a total loss of earnings of $11.5 million.

b. Foreseeability

At the time of the Financing Agreement, the Government acknowledged that First Federal would not be able to survive without the regulatory forbearance contained in Section 6.10. For the reasons discussed in Section I.B, *supra*, with regard to the foreseeability of lost profits on foregone assets, it was both actually foreseen and reasonably foreseeable that a breach of Section 6.10 would require First Federal to restructure its asset portfolio in order to achieve compliance with prevailing regulatory capital requirements and that such restructuring, while lowering risk, would also result in lower earnings.

c. Reasonable Certainty

First Federal established with reasonable certainty that it entered into portfolio restructuring transactions prior to the Canada Trust transaction, and that the aggregate net adverse impact on earnings was $487,500 per month. *See* PX 381 at FFR0052485; PX 8000 at 47; Tr. 3016:10-3022:23 (Kaplan), 1380:5-1381:12 (Chaplin); *see also* Tr. 5370:13-14 (Carron). However, First Federal failed to establish that it suffered the adverse effects on earnings of the restructuring transactions for more than two months.

In summary, First Federal suffered a total of $14.383 million in damages as a result of being compelled to merge with Canada Trust in 1991. As more fully set forth in Section V.D, *supra*, that total is comprised of $3 million to repurchase the warrant rights from the FDIC; $1.983 million in costs and fees incurred to complete the Canada Trust transaction, including professional fees of $880,000, New York State transfer taxes of $403,000, and a $700,000 payment to management resulting from the change in control; $2 million due to income lost by reason of the need to restructure First Federal's portfolio in order to comply with risk-based capital standards; and $7.4 million in lost tax benefits.

## IV. First Federal Did Not Breach the Conversion Covenant In Connection With Canada Trust's Initial Overtures

The Government argues that First Federal should not be awarded any damages because it committed a prior material breach of the Financing Agreement, which excuses the Government's liability for its later breach. The Government claims that First Federal violated the Financing Agreement when it rejected Canada Trust's overtures to acquire the Association during 1988 and 1989, and in failing to inform federal regulators that Canada Trust had made the overtures.

"'[W]hen a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach.'" *Barron Bancshares*, 366 F.3d at 1380 (citing *Coll. Point Boat Corp. v. United States*, 267 U.S. 12, 15 (1925)). "Faced with two parties to a contract, each of whom claims breach by the other, courts will 'often . . . impose liability on the party that committed the first material breach.'" *Id.* (citing E. Allen Farnsworth, FARNSWORTH ON CONTRACTS § 8.15 at 439 (1990)). However, "'[t]he Federal Circuit has made plain that not every departure from the terms of a contract is sufficient to be material.'" *Hometown Fin., Inc. v. United States*, 60 Fed. Cl. 513, 520 (2004) (quoting *Stone Forest*, 973 F.2d at 1550). For the Government to be excused from liability for its breach, therefore, the Court must determine if First Federal breached the Financing Agreement first and, if so, whether the breach was material. For the reasons set forth below, First Federal did not breach the Financing Agreement.

Section 6.04 of the 1986 Financing Agreement, the Conversion Covenant, stated:

> First Federal shall use its best efforts in good faith to complete the Common Stock Offering and to consummate the Conversion as soon as practicable, provided that the Board of Directors shall have reasonably determined that it is in the best interests of First Federal to proceed with the Conversion. First Federal shall furnish to the Supervisory Agent a semi-annual report, within 30 days after each June 30 and December 31 commencing December 31, 1986, as to its progress toward making the Common Stock Offering.

PX 17 at WOF0202000; *First Federal I*, 58 Fed. Cl. at 148, 165.

The Government points out that in 1988, Mr. Richard B. Coles, one of Canada Trust's officers, stressed to Mr. Borshoff that if First Federal were to consummate a merger with Canada Trust, not only would Canada Trust infuse sufficient capital to bring First Federal into regulatory capital compliance but First Federal "would get access to additional capital" and "would be able to expand and grow." DX 1778 at 13-14. Nevertheless, Mr. Borshoff informed Mr. Coles that First Federal had a plan to undertake a standard conversion and was not interested in a modified conversion with Canada Trust. Tr. 260:1-12 (Borshoff).

The Government argues that the FSLIC had a contractual right to be informed of all prospects and developments related to First Federal's obligation to convert. First Federal did not

mention Canada Trust until its January 30, 1991, semi-annual status report. PX 9 at FR000512-13. According to the Government, although Section 6.04 provided that the Board of Directors of First Federal had the discretion to determine if a conversion was in the best interests of the institution, First Federal had a fiduciary obligation to enter into meaningful discussions with Canada Trust in order to be in a position to make such a judgment. Tr. 5022, 5074, 5083-84 (Guttentag); 4205-06 (Unal).

To begin with, Section 6.04 required First Federal to "complete the Common Stock Offering and to consummate the Conversion as soon as practicable, provided that the Board of Directors shall have reasonably determined that it is in the best interests of First Federal to proceed with the Conversion." PX 17 at WOF0202000. The Board of Directors had discretion to determine what was in the best interests of First Federal, and the Board determined, prior to FIRREA, that pursuing a standard conversion was in the best interests of the Association. *See* PX 118 at FR055828; Tr. 200:11-22 (Borshoff). Though First Federal also understood that a modified conversion would be consistent with the Financing Agreement, the Association's preference was to enter into a standard conversion. First Federal reasonably viewed a modified conversion as a disfavored fallback. PX 113 at FR371726; Tr. 673:17-674:6 (Borshoff). That was because a modified conversion would result in:

1) Loss of control of the institution. Tr. 285:25 (Borshoff).

2) A loss of First Federal's GAAP net worth. Tr. 279:21-280:10; 286:1-11 (Borshoff).

3) A limitation on the benefit of the Association's NOLs. Tr. 285:19-22 (Borshoff).

4) The inability of First Federal's depositors to obtain stock in the former mutual association. Tr. 277:19-278:2; 285:23-286:11 (Borshoff).

A standard conversion gave management the opportunity to continue the successful operation of First Federal. The desire to remain independent was a natural and legitimate goal when considering conversion options. *See Commercial Fed.*, 59 Fed. Cl. at 355.[36] By opting for a standard conversion, First Federal would have been able to maintain its GAAP net worth and continue deriving the full benefit of its NOLs. Tr. 285:19-286:11. Also, a standard conversion was the only way to ensure that depositors would be given an opportunity to purchase stock. Tr. 673:17-674:6 (Borshoff). The conversion regulations called for the protection of depositors' interests in the converted association whenever possible. *See* 12 C.F.R. § 563b.3-10 (1986).

---

[36] The *Commercial Federal* court held that it was reasonable for managers of the thrift to want to avoid a loss of management control – even in the context of a standard conversion. 59 Fed. Cl. at 355. In this case, while First Federal's management welcomed a standard conversion, it did not want control of the thrift to rest in the hands of another bank via a modified conversion.

There was nothing unreasonable about determining, in light of the above, that a proposed acquisition by another bank was not in the best interests of First Federal.

Second, Section 6.04 obligated First Federal to report "as to its progress toward making the Common Stock Offering." PX 17 at WOF0202000. There is no evidence that First Federal did not provide semiannual reports as required by Section 6.04. The overtures by Canada Trust did not represent efforts by First Federal to make a common stock offering. They were overtures made by another bank to acquire First Federal. And, as Mr. Borshoff testified, in reliance upon the Financing Agreement, First Federal cut off conversations with Canada Trust executives as soon as they floated the idea of an acquisition. Tr. 265:11-19 (Borshoff). The initial overtures by Canada Trust did not contemplate a common stock offering, nor did Mr. Borshoff's discussions with Mr. Coles constitute progress toward making such an offering. Thus, First Federal did not breach Section 6.04 by not reporting such discussions prior to its January 31, 1991, semiannual report.

## V. Even Assuming That, From An Economic Point of View, the Government Bore the Risks of Ownership of First Federal at the Time of the Breach, a Mutual Institution Is a Legal Entity With Rights and Interests Distinct From Those of Its Owners, and First Federal Is Therefore Entitled to Recover From the Government Damages to the Association Caused by the Government's Breach

The Government argues that an award of damages in this case would violate sound economic and legal principles. That is because, according to Dr. Haluk Unal, one of the Government's expert witnesses, from an economic perspective, the Government owned First Federal at the time of the breach.[37] Dr. Unal emphasized one economic indicator of ownership in

---

[37] In support of Dr. Unal's analysis, the Government cited *Paulsen v. Commissioner* for the proposition that "the debt characteristics of [deposits in a mutual savings and loan] greatly outweigh the equity characteristics." 469 U.S. 131, 141 (1985). In *Paulsen*, petitioners argued that their exchange of stock in an incorporated savings and loan for passbook savings accounts and certificates of deposit in a mutual savings and loan qualified for tax-free treatment under 26 U.S.C. § 368(a)(1)(A) (1970). *Paulsen*, 469 U.S. at 132-33. Section 368(a)(1)(A) stated that no gain or loss would be recognized for tax purposes "if stock or securities in a corporation a party to a reorganization are . . . exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization." *Id.* at 135 (quoting 26 U.S.C. § 368(a)(1)(A)). The Supreme Court did not hold that the deposits in a mutual savings and loan did not represent an equity interest in the savings and loan; rather, it held that "if [the equity and the debt] interests were represented by separate pieces of paper – savings accounts on the one hand and equity instruments of some kind on the other – the value of the latter would be so small that we would not find a continuity of proprietary interest" of the sort that would be necessary to qualify for a tax-free reorganization. *Id.* at 141.

The Supreme Court further addressed petitioners' argument that, in *Tcherepnin v. Knight*,

his analysis: who bears the business risk? Tr. 4161:17-22 (Unal). In a stock corporation, stockholders bear the business risk; if the corporation fails, the stockholders lose their investment. Tr. 4142:2-9 (Unal). Dr. Unal contrasted corporate ownership with mutual ownership. There are no stockholders in a mutual savings and loan association. Instead, there are depositors, whose interests in the association are based on their deposits. Dr. Unal argued that the Government, not depositors, owns mutual savings and loan institutions, Tr. 4148:16-20 (Unal), because deposits are federally insured. If the association were to fail, the Government, and not the depositors, would bear the risk of loss. Tr. 4153:15-18 (Unal). Dr. Unal acknowledged that given the dollar limits on deposit insurance coverage, uninsured depositors "in theory" bear the risk of loss to some degree. However, since they are usually "sophisticated investors" they "try to have a feel about the performance of the institution" so that they can "exit the institution" before it becomes insolvent. Tr. 4153:22-4155:10 (Unal).

In the case of First Federal, according to Dr. Unal, the economic interests of First Federal's depositors were non-existent prior to the Canada Trust transaction. That was because the Association was insolvent as of 1982. Tr. 4200:9-15 (Unal). When First Federal entered the Phoenix program in 1982, the Association was, in essence, a nationalized institution. Tr. 4279:20-4280:5 (Unal). Later, pursuant to the Financing Agreement, the FSLIC forgave approximately $158 million in debt and was the only party to infuse capital ($200 million) into First Federal. PX 17 at WOF0201952-53; Tr. 2872:12-25 (Kaplan); 5008:3-9 (Guttentag). After the 1986 recapitalization, the FSLIC remained First Federal's insurer and, according to Dr. Unal, the only party bearing a risk of loss by the Association. Tr. 3416:20-22 (Palant), 4200:3-6, 4207:11-16 (Unal).

"[I]t is axiomatic that in general damages suffered by a corporation are recoverable by the corporation, not its shareholders." *Statement Sav. Holding Corp. v. United States*, 41 Fed. Cl. 1, 16 (1998) (citing *Twohy v. First Nat'l Bank*, 758 F.2d 1185, 1193 (7th Cir. 1985)); *see also Holland v. United States*, 59 Fed. Cl. 735, 739 (2004) ("Ordinarily a cause of action arising from an injury to a corporation belongs solely to the corporation, even though the injury may have also caused the shareholders to have suffered a diminution in the value of their stock."). That a corporation is a mutual institution does not change this principle. *See Koster v. (American)*

---

389 U.S. 332 (1967), it had considered a "withdrawable mutual association share . . . a 'security' within the meaning of § 3(a)(10) of the Securities Exchange Act of 1934." *Paulsen*, 469 U.S. at 143. It explained that "[t]he purpose of the Securities Acts is different from the purpose of the Tax Code." *Id.* Likewise here, the purpose of determining whether First Federal's depositors held equity interests in First Federal for purposes of determining whether the Association is entitled to recover damages from the United States is different from determining whether the depositors held equity interests for tax purposes. Irrespective of the soundness of Dr. Unal's analysis from an economic perspective, the depositors were the legal owners of First Federal. *See* Vojislav Maksimovic & Haluk Unal, *Issue Size Choice and "Underpricing" in Thrift Mutual-to-Stock Conversions*, 48 J. FIN. 1659, 1660 (1993) ("[T]he existing depositors . . . are legally the 'owners' of the mutual thrift . . . ."); *see also* Tr. 4283:16-4285:15 (Unal) (same).

*Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 522 (1947) (stating that policyholders in a mutual insurance company are analogous to stockholders, in that only policyholders may bring derivative suits on behalf of the company). A logical corollary to this principle is that, in an action by a corporation for damages, the remedy is determined by the damage sustained by the corporation, not the damage sustained by its owners. *Cf. Bernstein v. Levenson*, 437 F.2d 756, 757 (11th Cir. 1971) ("In a stockholders' derivative action the corporation, not the complaining shareholder, is the real party in interest, and the jurisdictional amount is measured by the damage sustained by the corporation.") (citing *Koster*, 330 U.S. at 522). Therefore, in order to determine damages, the Court must look to the injury to First Federal, irrespective of whether economically it was owned by its depositors or by the Government.

As Judge Merow held, First Federal is the real party in interest in this case. *See First Federal I*, 58 Fed. Cl. at 151-54. "First Federal's May, 1991 Plan of Conversion provided for institutional continuity. All property of the mutual association, including causes of action, vested in the stock association." *Id.* at 153.

> First Federal's ownership structure merely changed from a mutual to a stock association without loss of the substantive rights granted to First Federal under the 1986 Financing Agreement. First Federal had not assigned any claims for breach of the Financing Agreement in 1995 when it filed this action, First Federal was and remains the proper party. Accordingly, the First Federal stock association that filed its Complaint on August 7, 1995 is the same entity that entered the 1986 Financing Agreement.

*Id.* at 154. On January 9, 1997, after this lawsuit was filed, First Federal was merged into Marine Midland Bank, a subsidiary of HSBC. First Federal's substantive cause of action flowed through the merger to Marine Midland, the surviving corporation.[38] *Id.* at 154. "The Merger Agreement provides it is governed by New York law. . . . Under New York law, Marine Midland is

---

[38] The Bank Plan of Merger between Marine Midland and First Federal specified that Marine Midland, acquired all "property, rights, powers, duties and obligations," of First Federal including:

> any claim, right, benefit or administrative or judicial proceeding comprising, arising out of, or resulting from that litigation filed by First Federal in the United States Court of Federal Claims styled First Fed. S&L Ass'n of Rochester v. United States, No. 95-S17C (sic) (Fed. Cl. filed Aug. 7, 1995).

*See First Federal I*, 58 Fed. Cl. at 154.

considered a continuation of First Federal and, by operation of law, any pending litigation continues as if the merger had not occurred."[39] *Id.*

Despite the fact that First Federal is the real party in interest, Dr. Unal reasoned that because the Government was the economic owner of First Federal, an award of damages against the Government in this case would constitute a "windfall" to Canada Trust and its successors and would constitute "an absurdity" because the entity that bore the risk of loss at the time of the breach, in Dr. Unal's view the owner at the time of the breach, would be required to pay the judgment. Tr. 4203:4-25.[40]

Again, whatever the merits of Dr. Unal's analysis as a matter of economics, the fact that the breach in this case was committed by the Government does not alter the remedies to which First Federal is entitled. *See Winstar Corp.*, 64 F.3d at 1551 (quoting *Lynch*, 292 U.S. at 579 ("When the Government enters into such contracts, 'its rights and duties therein are generally governed by the law applicable to contracts between private individuals.'")); *First Federal I*, 58 Fed. Cl. at 160 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 346, cmt. a ("'Every breach of contract gives the injured party a right to damages against the party in breach' unless 'the parties . . . by agreement vary the rules'")). Thus, First Federal is entitled to recover from the Government damages to the Association caused by the Government's breach.

---

[39] As Judge Merow explained, immediately before HSBC purchased First Federal's stock from Canada Trust, CTUS, the holding company that had been formed by Canada Trust in 1991 for the purpose of acquiring First Federal,

> created two classes of stock: (1) common stock that was conveyed to HSBC, and (2) preferred stock that retained beneficial interest in any recovery in this action (denoted as the "FIRREA preferred tracking shares" that held the "interest, the net value of the results of the FIRREA claim"). . . . Following a series of interrelated conveyances, those shares are owned by FIRREA, Inc.

*First Federal I*, 58 Fed. Cl. at 157. Mr. Mullin testified at trial that FIRREA, Inc. is now part of the TD Bank Financial Group, a subsidiary of which acquired Canada Trust in 2000. Tr. 3373:24-3376:22 (Mullin).

[40] Dr. Unal conceded that it would have been appropriate for First Federal as a mutual association to recover damages for breach of contract where the breach was committed by a party other than the Government. Tr. 4339:5-13 (Unal).

**VI. First Federal Established That It Suffered $96.581 Million in Damages as a Result of the Government's Breach of the Financing Agreement, But That Figure Must Be Reduced or Offset By An Amount Sufficient to Account For the Benefits That Flowed to First Federal As a Result of the Canada Trust Transaction**

First Federal established that it suffered damages in the amount of $96.581 million as a result of the Government's breach of the Financing Agreement. First Federal suffered lost profits damages of $26.061 million as a result of foregone asset growth in 1989; damages of $56.137 million as a result of its inability to consummate a merger with Monroe; and $14.383 million damages suffered as a result of the Canada Trust transaction (including $3 million to repurchase the warrant rights from the FDIC; $1.983 million in costs and fees incurred to complete the Canada Trust transaction, including attorneys' fees of $880,000, New York State transfer fees of $403,000, and a $700,000 payment to management resulting from the change in control; $2 million due to income lost by reason of the need to restructure First Federal's portfolio in order to comply with FIRREA's risk-based capital standards; and $7.4 million in lost tax benefits).

The Government argues that the Canada Trust transaction benefitted First Federal and mitigated any harm that was caused by the breach. A breaching party is not responsible for harm that could have been "avoided by reasonable efforts" by the non-breaching party. *Robinson v. United States*, 305 F.3d 1330, 1333 (Fed. Cir. 2002); *see also LaSalle Talman*, 317 F.3d at 1371. The Federal Circuit held in *LaSalle Talman* that where there is a direct relationship between a breach of contract and the plaintiff's mitigation efforts, plaintiff's damages must be reduced by the benefits achieved in mitigating the harm. 317 F.3d at 1371-73. "'Where the defendant's wrong or breach of contract has not only caused damage, but has also conferred a benefit upon plaintiff . . . which he would not otherwise have reaped, the value of this benefit must be credited to defendant in assessing the damages.'" *Id*. at 1372 (quoting CHARLES T. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES 146 (1935)).

The Government contends that Dr. Kaplan's damages model is flawed because it continues to calculate lost profits damages on foregone assets after the modified conversion took place in May 1991. *See* Tr. 5398:19-5400:15 (Carron). After the Canada Trust transaction, the Government points out, First Federal acquired more than $900 million in deposits. Tr. 5389:4-18 (Carron). Dr. Carron testified that it is unlikely that the non-breached First Federal would have made such acquisitions prior to a standard conversion because of the effect of paying deposit franchise premiums on the tangible net worth of the institution. Tr. 5389:19-90:1 (Carron). However, Mr. Chaplin testified that, but for the breach, First Federal would have had opportunities to grow profitably in 1990-1991 because the RTC was liquidating savings associations at that time. Tr. 1261:24-1262:9; 2322:22-2323:2 (Chaplin). In that environment, Mr. Chaplin testified, it would have been possible for First Federal to acquire deposit franchises for almost no cost. Tr. 1261:24-1262:9.

As established in Section III.C, *supra*, First Federal would have obtained approximately $220 million in gross proceeds and $177.5 million in net proceeds from a standard conversion in mid-1993, two years after the Canada Trust transaction in May 1991. First Federal obtained

$188 million in gross proceeds and $58 million in net proceeds from the Canada Trust transaction. *See* Section III.B, *supra*. Dr. Kaplan acknowledged that receiving capital two years earlier would have been beneficial to First Federal. Tr. 3047:22-24 (Kaplan). Dr. Kaplan quantified the benefit First Federal received from the Canada Trust transaction, *see* Tr. 2986:17-19; 3047:19-3048:9 (Kaplan), and then deducted that benefit from his damages calculation. Tr. 3047:24-3048:2 (Kaplan).

In determining the amount to be offset against First Federal's damages, Dr. Kaplan compared the experience of the actual bank with a hypothetical nonbreach bank. Tr. 3054:1-5 (Kaplan). Dr. Kaplan focused on what the assets and liabilities of the two banks were and would have been, respectively, and what the banks' earnings were and would have been. In that vein, Dr. Kaplan looked at foregone assets, profitability, "and especially in financial institutions, the last piece of that equation is you're looking at the capital account, because . . . I think everybody . . . knows how important capital is to the generation of growth in earnings in the banking business." Tr. 3054:10-15 (Kaplan). "[T]here are the capital adjustments going on that are beyond simply the retention of the earnings of the nonbreach bank. And that's because we have on the one hand the capital contributed by Canada Trust and the capital that would have been [contributed] in the standard conversion." Tr. 3055:4-8 (Kaplan).

Dr. Kaplan calculated the cash adjustments to First Federal's capital account in determining the proceeds First Federal would have derived from a standard conversion in 1993. *See* Section III.C, *supra*. Specifically, Dr. Kaplan calculated the amount of capital First Federal would have derived from a standard conversion as opposed to the modified conversion. He then reversed the amount of dividends that First Federal paid to Canada Trust following the modified conversion, and he subtracted the amount of dividends First Federal would have paid its shareholders after a standard conversion. Dr. Kaplan then determined the amount of after-tax retained earnings that First Federal would have had in its capital account following a standard conversion. *See* Tr. 3554:13-3561:7 (Kaplan); PX 8000 at 77 ("Adjustments to Capital Account"), 78 ("Fourth Component of Lost Profits Damages: Offset Calculation"); PX 754.

In the next step of his offset calculation, Dr. Kaplan multiplied the cash adjustments to capital by the rate of return derived from short-term Treasury securities. Tr. 3561:8-3562:24; 4063:7-4064:7; PX 8000 at 73, 78; PX 753. The result was an offset of $8 million, which Dr. Kaplan testified, captured the benefit to First Federal of receiving capital from the Canada Trust transaction in 1991.

As discussed in Section III.C, *supra*, in determining the amount of after-tax retained earnings that First Federal would have had in its capital account following a standard conversion, Dr. Kaplan overstated the amount of lost profits that First Federal suffered as a result of restructuring its portfolio in preparation for the Canada Trust transaction. *See* Tr. 3549:5-3561:18 (Kaplan); PX 8000 at 73 (Columns G, H), 77 (Columns G, H), 78; PX 753 (Columns G, H); PX 754 (Columns G, H). As a result Dr. Kaplan overstated the amount of proceeds First Federal would have derived from its standard conversion. *See* Tr. 3055:14-3056:19 (Kaplan); *see also* note 26, *supra*. In using that overstated amount as an input, Dr. Kaplan also necessarily

miscalculated the amount of offset due to the benefits of the Canada Trust capital infusion in 1991. *See id.* First Federal must therefore recalculate the proceeds it would have derived from a standard conversion in 1993, and determine what the corresponding change in the offset would be, in light of the fact that the Court has found that First Federal lost $487,500 in earnings for only two months as well as $48,750 for 23 months as a result of restructuring its portfolio, instead of losing $500,000 per month for 23 months, as it claimed. As Dr. Kaplan testified, calculating the proceeds and the offset is an arithmetical undertaking, which he executed with regard to other scenarios during trial. *See, e.g.*, Tr. 3654:2-3665:6 (Kaplan); PX 758; PX 759; PX 8004.

The Government argues that other aspects of Dr. Kaplan's capital account adjustments are flawed. The Government maintains that First Federal benefitted from having raised capital earlier and in a greater amount than the standard conversion contemplated in Dr. Kaplan's model, which showed net proceeds of $177.5 million from a standard conversion in the second quarter of 1993. The Government contends that the proceeds First Federal claims it would have raised in a standard conversion are nearly $48 million less than First Federal actually realized as a result of the capital infusion from Canada Trust of $188 million in May 1991, the nearly $2 million from senior management, subsequent capital infusions by Canada Trust of $27.7 million through June 30,1993, and after-tax earnings generated from the capital infusions of $14 million, less $6 million paid in dividends during that time period. DX 2028; Tr. 4857:4-4859:17 (Rochester).

According to the Government, the first reason the benefits of the Canada Trust transaction were understated is that Dr. Kaplan calculated the earnings on his capital account adjustments at the six-month Treasury rate. Tr. 4017 (Kaplan); PX 8000 at 73. The Government argues that Dr. Kaplan's use of the Treasury rate disregards evidence that First Federal invested the $188 million in Canada Trust conversion proceeds in a portfolio of mortgage-backed securities, which yielded 8.62 percent. Tr. 1985-86 (Chaplin); PX 473 at FR002351; Tr. 1998-99, 5717-18 (Chaplin), 5390 (Carron), 3043-44 (Kaplan); PX 105G at FR016943; DX 1167 at FR153360. By using an investment rate that does not account for the true earnings benefit that First Federal derived from the Canada Trust capital infusion, the Government maintains, Dr. Kaplan understated the benefits of the modified conversion, which would affect the size of the offset and the amount of damages to which First Federal is entitled. Tr. 5391-92 (Carron). Dr. Carron testified that correcting Dr. Kaplan's model to utilize the rate of return on mortgage-backed securities would increase the benefit that First Federal derived from the modified conversion from $8 million to $36.6 million. DX 2046 at 62; Tr. 5400 (Carron).

First Federal did not add any mortgage-backed securities to its portfolio as a result of Canada Trust's capital infusion. As part of its effort to restructure its portfolio before the modified conversion, First Federal sold mortgage-backed securities. Tr. 5916:7-13 (Kaplan). After receiving the $188 million capital infusion from Canada Trust, that capital was reinvested in mortgage-backed securities, replacing the mortgage-backed securities that the Association had sold. If, as of the second quarter of 1993, the breached First Federal had $188 million in mortgage-backed securities *in excess of* what it had immediately before the Canada Trust transaction, then the mortgage-backed security rate would be the appropriate rate for calculating

earnings on Canada Trust's capital infusion, because that would mean First Federal simply added $188 million to its balance sheet and derived benefit from those assets. *See* Tr. 5719:14-5720:4 (Kaplan). However, that was not the case. In calculating the offset, Dr. Kaplan regarded the Canada Trust proceeds as a source of funds that First Federal used to repurchase its mortgage-backed securities following the acquisition. Tr. 5917:20-5918:24 (Kaplan). Dr. Kaplan testified that the appropriate way to perform an offset calculation was to select a funding rate, because that would best capture what was going on with the infusion of capital from Canada Trust. Because the short-term Treasury rate is a rate that can properly be used to calculate the cost of funds, Dr. Kaplan testified that the Treasury rate was an appropriate rate to use in calculating the earnings derived from the Canada Trust infusion. Tr. 5917:11-5918:4 (Kaplan). Because First Federal used the Canada Trust capital to replace the mortgage-backed securities that it had sold in preparation for the Canada Trust acquisition, Dr. Kaplan's use of the short-term Treasury rate as a funding rate was appropriate.

The second reason Dr. Kaplan understated the benefits of the Canada Trust transaction, according to the Government, is that he failed to include in his offset analysis the benefits First Federal derived from nearly $64 million in capital infusions that Canada Trust made after its initial $188 million infusion. The Government maintains that First Federal understood that Canada Trust would provide whatever additional capital First Federal required to implement a sound and profitable strategic plan. Tr. 5021-22 (Guttentag), 4448 (Rochester). Pursuant to this understanding, Canada Trust subsequently infused an additional $63.8 million into First Federal. Tr. 3560:19-23.

The subsequent infusions from Canada Trust, however, were not a part of the modified conversion and were not made in an attempt to reduce the impact of the Government's breach. Only profits "directly due to the actions in mitigation" are recognized "as reducing the damages attributable to the breach." *LaSalle Talman*, 317 F.3d at 1373. The subsequent infusions from Canada Trust took place in 1993, 1995, and 1996 – years after both the breach and the modified conversion.[41] Canada Trust's management had the discretion to make infusions of capital beyond the initial $188 million. Tr. 5893:15-5894:17 (Kaplan). Both entities viewed future infusions as possible, but not automatic. In fact, Canada Trust considered requests for additional capital only on a case-by-case basis, subject to a hurdle rate of between 18 and 20 percent. *See* Tr. 287:8-21 (Borshoff); *see also* Tr. 5080:12-25 (Guttentag).

In *LaSalle Talman*, another *Winstar* case, the plaintiff bank was recapitalized by the international bank ABN AMRO as a direct consequence of the Government's breach of contract. The Federal Circuit held that the recapitalization was properly credited in mitigation. *LaSalle Talman*, 317 F.3d at 1374. Later, however, after the plaintiff bank became a subsidiary of ABN AMRO, the bank received additional capital infusions in order to finance the acquisition of other banks and to finance a merger with another ABN AMRO subsidiary. *Id.* The Federal Circuit

[41] Canada Trust placed a moratorium on any capital infusions for the first two years of the relationship. Tr. 896:15-20 (Borshoff).

held that the subsequent transactions constituted commercial activity that was remote from the earlier actions taken to achieve compliance with FIRREA. *Id.* ("This activity financed by ABN AMRO was not related, either in time or in effect, to the recapitalization of Talman's lost goodwill.") As a result, the Federal Circuit held that the amount of benefit derived from the subsequent capital infusions was not properly considered part of mitigation, and it was improper to offset the damages due the plaintiff by that amount. *Id.*

The subsequent capital infusions in *LaSalle Talman* were similar to those in this case. There is no dispute that Canada Trust provided an infusion of $188 million so that First Federal could achieve compliance with FIRREA's capital standards. The subsequent capital infusions, however, were provided for a different purpose. Tr. 5893:15-5894:17 (Kaplan). Those infusions were provided in order to fuel Canada Trust's further expansion into the United States market, not to ensure any further capital compliance with FIRREA. *Id.* Canada Trust's subsequent capital infusions were too remote from the breach in purpose and in time to be considered mitigation. It was, therefore, proper for Dr. Kaplan to disregard the benefits of those subsequent infusions in calculating the amount to be offset in this case.

The Government argues in the alternative that even if Dr. Kaplan did properly exclude the benefits of the subsequent capital infusions in calculating the amount of the offset, he reduced the offset by too great an amount in taking account of the dividends that First Federal paid to Canada Trust. Tr. 5395-96 (Carron). Dr. Kaplan's model based First Federal's earnings benefit on only 75 percent of the total capital infused by Canada Trust – $188 million of the $251.8 million total capital infused. However, Dr. Kaplan reduced the offset amount by the *entire* amount of dividends that First Federal paid to Canada Trust. Tr. 5901-02 (Kaplan). It was not inappropriate for Dr. Kaplan to deduct all of the dividend payments from his offset calculation. But for the breach, First Federal would not have paid Canada Trust any dividends. The only reason First Federal paid Canada Trust any dividends was because it was required to do so. Tr. 5901:20-5902:3 (Kaplan).

The Government also argues that embedded in Dr. Kaplan's capital account adjustments is a calculation of interest that would have been earned by First Federal on its lost profits, including lost profits on the foregone assets, on the Monroe assets and income that would have been realized but for the portfolio restructuring. DX 2046 at 62. The Government contends that this interest in Dr. Kaplan's model, which amounts to more than $9.8 million, is pre-judgment interest that cannot be awarded to First Federal. DPCL at 51. Pre-judgment interest may only be awarded against the United States when authorized by contract or statute. 28 U.S.C. § 2516(a) (2000); *Library of Congress v. Shaw*, 478 U.S. 310, 315 (1986). The Government contends that no such contract exists in this or any other *Winstar* case. *See Glendale Fed. Bank, F.S.B. v. United States*, 43 Fed. Cl. 390, 410 (1999), *aff'd in part, vacated in part, & remanded*, 239 F.3d 1374 (Fed. Cir. 2001); *Far West Fed. Bank v. OTS*, 119 F.3d 1358, 1366-67 (9th Cir. 1994); *Columbia First Bank, FSB v. United States*, 54 Fed. Cl. 693, 699-700 (2002) (claim for compensation in cost of replacement model related to lost use of money barred as impermissible pre-judgment interest).

As Dr. Kaplan explained at trial, however, what the Government contends constituted interest actually constituted earnings on retained earnings. Dr. Kaplan included earnings on retained earnings in his damages analysis because it is customary for thrifts to do so in accounting for earnings. Tr. 5877:14-5878:24 (Kaplan).

> [In] the normal course of business of every bank and thrift institution in this country, at the end of an accounting period . . . an institution takes its pre-tax earnings, [and] determines the appropriate tax. The remainder goes into retained earnings and augments its capital and is part of the capital base in subsequent periods to fund the entire operation. This goes on year after year, in every financial institution. That's the way accounting for earnings is done and how it augments capital. And it's entirely appropriate.

Tr. 5878:1-5878:11 (Kaplan).

The Court concludes that Dr. Kaplan properly calculated the offset, given the inputs he relied upon.

## VII. First Federal Contended That the Offset Should Be $8 Million, But That Figure Must Be Recalculated In Light of the Court's Reduction From $11.5 Million to $2 Million of the Damages Claimed By First Federal to Have Resulted From Portfolio Restructuring Transactions Undertaken in Advance of the CT Acquisition In Order to Achieve Compliance With FIRREA's Risk-Based Capital Requirement

Dr. Kaplan calculated that, in consideration of the benefits First Federal received from the Canada Trust transaction, the damages due First Federal should be reduced by an offset of $8 million. Tr. 3563:7-21 (Kaplan); PX 8000 at 73, 82. However, as explained in Sections III.D.4 and VI, *supra*, in light of this Court's findings with respect to damages sustained by First Federal in connection with portfolio restructuring transactions undertaken in advance of the CT acquisition, Dr. Kaplan overstated the proceeds First Federal would have derived from a standard conversion in 1993, which in turn affects the size of the offset. First Federal claimed that it suffered damages of $11.5 million as a result of restructuring its portfolio before the Canada Trust transaction. The Court, however, has concluded that First Federal suffered damages of only $2 million as a result of the restructuring. *See* Section III.D.4, *supra*.

The Court is hesitant to itself attempt to calculate from the present record the proper amount of the offset in light of the differences between the Court's findings and inputs utilized by Dr. Kaplan. The Court will therefore require First Federal to recalculate the amount of proceeds that the Association would have derived from its standard conversion in 1993, and the resulting offset to the damages to which the Court has concluded First Federal is otherwise entitled, $96.581 million, in light of the Court's finding that First Federal suffered damages of $2 million rather than $11.5 million as a result of restructuring its asset portfolio prior to the Canada Trust transaction.

## ***CONCLUSION***

Until the offset has been recalculated in accordance with the Court's findings, it is not possible to determine the net amount of damages due First Federal and therefore the Court cannot enter judgment in its favor at this time for a sum certain. Therefore, the Court ORDERS that plaintiff shall file on or before **May 15, 2007**, a revised calculation of the proceeds that First Federal would have received from a standard conversion in 1993, taking into account the Court's findings described above. Plaintiff shall also provide, in light of those findings, a revised calculation of the amount to be offset against the $96.581 million in damages to which the Court has concluded First Federal is otherwise entitled. *See* Section VI, *supra*. The Government, should it choose to do so, may file a responsive calculation on or before **June 12, 2007**. The Court will thereafter determine what further proceedings, if any, are necessary in order to permit the Court to determine the net amount of damages due plaintiff. The Court then intends to enter a final judgment on damages pursuant to RCFC 54(b), and provide for the ascertainment of attorneys' fees and non-taxable costs pursuant to Section 8.10 of the Financing Agreement following the resolution of any appellate proceedings related to the Court's judgment with respect to damages.

IT IS SO ORDERED.

s/ George W. Miller
GEORGE W. MILLER
Judge